**In re CELERYVALE TRANSPORT, INC., Debtor.**

**Richard P. JAHN, Jr., Trustee, Plaintiff,**

v.

**M.W. KELLOGG COMPANY, INC., d/b/a Pullman Trailmobile and Federal Insurance Company, Defendant.**

**Bankruptcy No. 1–81–01933.**
**Adv. No. 1–81–0838.**

United States Bankruptcy Court, E.D. Tennessee.

Nov. 9, 1984.

Richard P. Jahn, Jr., Tanner, Jahn, Anderson, Bridges & Jahn, Chattanooga, Tenn., for Trustee.

William H. Horton and David Fulton, Gearhiser, Peters & Horton, Chattanooga, Tenn., for defendant, M.W. Kellogg Company, Inc.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge

The first question in this case is whether a lease between the debtor, Celeryvale Transport, and the defendant, Trailmobile, is a true lease or a lease intended for security. Trailmobile leased to Celeryvale 30 refrigerated trailers of the kind used with an over-the-road tractor to form a tractor-trailer or semi-trailer rig, commonly called a big truck. Celeryvale later went into bankruptcy. The trustee contends that the lease is one intended for security and Trailmobile is therefore the holder of a security interest in the trailers rather than the owner. He also contends that Trailmobile failed to perfect its security interest because the certificates of title show it as owner of the trailers rather than as lienholder with Celeryvale as the owner. This second question, however, need not be considered unless the lease is found to be a lease intended for security.

The trailers were sold by Trailmobile manufacturing which sold the promissory notes and title certificates to Trailmobile Finance which accounted for the trailers as its assets. Trailmobile Finance later became part of Signal Capital Corporation.

The trailers were ordered as follows:

| Order Date | No. of Trailers | Trailer Length | Unit Price |
|---|---|---|---|
| 9–20–1979 | 5 | 42.5 ft. | $ 28,617 |
| 9–20–1979 | 5 | 45 ft. | $ 28,967 |
| 6–16–1980 | 8 | 44 ft. | $ 27,459 |
| 6–16–1980 | 12 | (?) | $ 29,859 |

The trailers were all ordered with the refrigeration units installed. Trailmobile paid for the units and their installation and added the cost in determining the amount of the lease payments by Celeryvale.

Celeryvale ordered the trailers with the refrigeration units by executing four forms each identified as a "TRAILER SALES ORDER". The forms contain the terms necessary for a sale but the acceptance was never executed by Trailmobile. In one place, the "selling price" is filled in, but in the section beginning "Purchaser agrees to pay", the blanks are not filled in. Instead, there is the typed notation "ITC LEASE" on the first two forms and "ITC LONG

TERM LEASE, 96 months" on the last two forms. Ralph Triplett was the salesman for Trailmobile. He testified that the sales order form was used to begin long term lease transactions.

Celeryvale was required to pay two months of rent in advance on the ten trailers ordered in 1979. On the twenty trailers ordered in 1980, Celeryvale was required to pay four months of rent in advance. The lease ran for 96 months from the delivery of the trailers to Celeryvale.

The initials "ITC" in the orders stand for investment tax credit. An investment tax credit lease is one in which the lessor retains the investment tax credit. This increases the lessor's return by providing a tax credit at the beginning of the lease. This in turn allows the lessor to reduce the monthly rental payments that the lessee must pay. The lease itself explains:

> The rent payable hereunder has been negotiated upon the basis that LESSOR will realize and recognize for Federal Income Tax purposes the entire economic benefit of Investment Tax Credit applicable to this Lease.... Rent payable hereunder has been established at a reduced rate on the account of the anticipated benefit to LESSOR of the Investment Tax Credit, which benefit has been passed through to Lessee in the form of reduced rent. If for any reason other than LESSOR's fault or negligence LESSOR is unable to realize or recognize the full amount of Investment Tax Credit anticipated in establishing the rent hereunder, LESSEE upon demand, shall pay to LESSOR as additional rent an amount equal to the amount of Investment Tax Credit LESSOR is unable to realize or recognize, including an amount equal to the Federal Income Tax thereon, if any.

For example, since the investment tax credit was 10% of the selling price of about $28,000, then Trailmobile would have about a $2,800 credit against taxes. This is not a deduction from income but a deduction from taxes, the same as if Celeryvale paid $2,800 of Trailmobile's taxes. Trailmobile would have an extra $2,800 from the time the credit was used, which could be treated as money held at interest from then until the end of the lease. This, of course, reduced what Celeryvale had to pay to obtain the use of the trailers.

Trailmobile also figured that the trailers in question would have a residual value at the end of the lease of 10% of the selling price. In the example above, the repossession of the trailer at the end of the lease would be like another $2,800 payment to Trailmobile. This further reduced the amount Celeryvale had to pay under the lease.

Generally, trailers retaken at the end of a lease were sold for more than 10% of their original price, closer to 15% of their original price. Trailmobile used a conservative estimate of residual value for its own protection. If Trailmobile received at least 10% of the original price at the end of the lease, then the lease would have been comparable to a sale as an investment. Actually, the rate of return on leases was set to be slightly higher because of the added risk that the trailers might not have the expected residual value at the end of the lease.

Of course, the calculation of rent under the lease also had to take into account the interest charged on installment sales. The rent was calculated by the salesmen by multiplying one-thousandth of the price by a factor provided by the home office. The factor took into account the investment tax credit, the expected residual value of the trailers at the end of the lease, and the interest charged on conditional sales.

Ralph Triplett was Trailmobile's salesman in the transaction with Celeryvale. He negotiated with L.D. Miller, III, known as Mickey Miller, who was Celeryvale's president. Mr. Miller testified that Celeryvale could not have used the investment tax credits because it did not make enough profit to owe any taxes. As to the first ten trailers, Mr. Triplett calculated that it would cost Celeryvale about $11,000 less to lease a trailer for eight years than to buy with eight year financing. The monthly payments under a conditional sale contract would have been more than $100 more than

the monthly lease payments. Mr. Triplett's commission on a lease was computed as a percentage of profit, the same as in a sale.

The option to purchase was not part of the printed lease form but was stamped in at the end. Mr. Triplett said that he included the option in all the leases he negotiated. The option reads as follows:

Provided LESSEE has at all times during the term of this Lease promptly discharged each and every obligation on LESSEE'S part to be performed hereunder, and is not in default of any provision hereof at the time of exercise of the option herein granted, LESSEE is hereby granted the right and option to purchase all (but not a part of) the Leased Equipment as of the end of the term of this Lease. The purchase price shall be the fair market value of each item of the Lease Equipment so purchased. Fair market value shall be established by independent appraisers, so long as the purchase price thus established is acceptable to both LESSOR and LESSEE. LESSEE may exercise this option only in accordance with the following procedure:

(a) LESSEE shall give LESSOR thirty days written notice of LESSEE's intention to purchase.

(b) LESSEE'S notice, to be effective, must be accompanied by payment of monthly rental charges for all Leased Equipment through and including the proposed date of purchase, and the amount of the purchase price of the Leased Equipment.

The option only allows the lessee to buy the trailers in groups. In this case, Celeryvale apparently could have bought all the trailers covered by one sales order but could not have purchased some of the trailers covered by one order.

Mickey Miller testified that he expected the trailers to be worth at the end of the lease about 10% of their original selling price but he knew the option was not set at 10%. John Sanford worked for Trailmobile for two years between 1981 and 1983, in finance and accounting. He testified that Trailmobile did not automatically accept the estimated residual value, 10% of the price in this case, as the fair market value at the end of the lease. Though a sale for the estimated residual value would have made the lease comparable to a sale as an investment, Trailmobile bargained at arm's length to determine the fair market value.

The trustee's exhibit 14 shows sales of refrigerated trailers at the end of several leases, including one eight year lease and two seven year leases. The exhibit does not say whether these were sales to lessees under the option. The residual value of the trailers under the eight year lease was estimated at about 11% of their price and they were sold for about 15%. Under one of the seven year leases (Whitaker), the sale price at the end of the lease was about 20% of the original price, which was more than the estimated residual value of 16%. Under the other seven year lease (Lewis), the trailers sold for less than the estimated residual value, 11% compared to 13%.

Ralph Triplett testified that Celeryvale and Trailmobile each would have appraised the trailers and a third party, perhaps a competitor, would have appraised them, and the average of the three would have been used as the fair market value.

Robert Campbell testified as to the financer's actions in the event of a default under a lease. In a conditional sale a default would lead to a foreclosure sale, but a default under a lease might lead to a releasing, if that would be more profitable than a sale. If there was a deficiency after selling trailers repossessed from a lessee, Trailmobile would try to collect it from the lessee if the attempt appeared to be worthwhile.

Robert Mowery was the trustee's expert witness on the value of used refrigerated trailers. Mr. Mowery has been in the business of buying and selling new and used trailers for about 20 years. For almost ten years, he has operated his own business. He estimated that in terms of gross income about 40% of his business is from selling used trailers but not more than 10% is from selling used refrigerated trailers.

He testified that a refrigerated trailer has a useful life of about eight years for road use. Dry trailers have a longer useful life and hold their value better because they are easier to repair. He admitted that he had sold refrigerated trailers more than eight years old. In 1976 he sold a 1965 model 40′ trailer for storage use for $2,860. The trailer was still suitable for road use. It had been modified before the sale by adding a bifold entrance to reduce the loss of air when the doors were opened. Also in 1976 he sold a 1967 model 40′ trailer for $5,200. In November, 1983, he sold a 1971 model, 42′ trailer for about $3,500. He testified that the last two trailers probably had some reconditioning done before the sales since his company usually did some repairs, such as painting and changing tires, before selling a used trailer.

He appraised 28 of the 30 trailers in question in November, 1981. He valued them at $18,000 to $21,500 depending on length and condition and assuming the refrigeration units worked. Mickey Miller testified that all the refrigeration units worked at the time of bankruptcy. Mr. Mowery said that he would pay $3,000 to $5,000 wholesale for an eight year old refrigerated trailer that had been used for hauling.

Mr. Mowery looked at advertisements in several trade publications for trailers more than eight years old. The advertised prices ranged from $2,300 for a 1972 model refrigerated trailer without the refrigeration unit and in need of tires to $9,500 for another 1972 model. Mr. Mowery said these were asking prices, that the sellers would take less, and that the trailers had probably been reconditioned by the sellers. He denied that it was common (not unusual) to sell trailers ten and twelve years old for substantially more than $5,000.

Mr. Mowery also looked at the Taylor and Martin True Value Guide. Taylor and Martin is a large, nationwide auction company specializing in trucks and trailers. The guide is a report of auction prices, either a composite or specific examples. Bidders at the auctions include both dealers and users so that the prices are not necessarily wholesale prices. There were three listings of sales of 1975 model Trailmobile refrigerated trailers. The prices ranged from $2,450 to $5,600.

Mr. Mowery also testified that the price of new trailers has risen rapidly since 1974 —from about $25,000 to $35,000 to $40,000 for comparable trailers. This generally brought up the price of used trailers, but the price of used refrigerated trailers did not keep up because of improvements in refrigeration units and a change in the law to allow trailers up to 48 feet long. The older shorter trailers with the less efficient refrigeration units did not keep up with the general price increase.

Mr. Triplett, Trailmobile's salesman, testified that the useful life of a refrigerated trailer depends on its treatment. Generally they will last ten to fifteen years. The lease schedules included an estimated loss guide for insurance purposes only. It valued the trailers after eight years at 20% of what they cost new.

Mr. Triplett testified that a trailer eight years old at the time of the trial would have a retail value of $12,000 to $14,000. He testified that in the past year the retail price of used refrigerated trailers 44 feet long had ranged from $9,500 to $15,500. He also testified that new refrigerated trailer prices had risen from a range of $17,000–$20,000 in 1975 and 1976 to $28,000–$29,000 in 1979 and 1980 and finally to about $40,000 in 1984. Furthermore, this rise in new trailer prices caused a rise in used trailer prices.

Mickey Miller testified that in six to eight years the highways in this country will shake a refrigerated trailer to pieces. He wouldn't send an eight year trailer on a trip from here to Seattle, but eight and nine year old trailers are bought for short hauls by private carriers such as grocers. In a short haul, the delivery can be made before the cargo thaws if the refrigeration unit stops. Mr. Miller now works for Southwest Motor Freight, a company with about 1100 trailers and 650 tractors. He testified that most of the big trucking com-

panies trade out their refrigerated trailers after five years. He estimated that the trailers he leased from Trailmobile would be worth less than 10% of their sales price because of the change in the law to allow trailers up to 48' long. He expected Southwest Motor Freight to dispose of 800 trailers 45' or shorter within the next year. He testified that some of Celeryvale's other refrigerated trailers were sold at auction in December, 1981, for $1,200 each. They were made in 1971, 1972, and 1973, and one in 1974. The refrigeration units worked. However, all the trailers suffered from a usual problem, damage to the floor in the back caused by forklifts used for loading and unloading.

The lease in question was much like a conditional sale contract as to the liabilities and obligations it imposed on Celeryvale as lessee. The lease imposed interest on overdue rent payments. It required Celeryvale to provide liability insurance and insurance on the trailers. Celeryvale did provide the insurance. Celeryvale was also obligated to indemnify Trailmobile for any claims it was forced to pay in connection with Celeryvale's use of the trailers. Celeryvale was obligated to pay all taxes on the transaction or on the trailers. Celeryvale was not allowed to sublease or otherwise hire out the trailers to third parties, except for short term interchanges with other carriers. Celeryvale agreed to obtain Tennessee title certificates showing Trailmobile's interest as lessor. Trailmobile had the title certificates issued to it as owner, without any indication of Celeryvale's interest, and retained the certificates at its office in Chicago. Trailmobile executed a form that allowed Celeryvale to register the trailers in its name, which it did.

Though the lease allowed it, Trailmobile did not attach any signs to the trailers showing that it was the lessor. Celeryvale was allowed to make improvements or changes only with Trailmobile's consent but any improvements would become Trailmobile's property.

All risk of loss or damage was on Celeryvale. It was required to make all repairs or to reimburse Trailmobile if it paid for repairs. However, Trailmobile gave a one year warranty against defects in workmanship or material and a warranty for the term of the lease on the support legs.

If a trailer was lost or damaged beyond repair, Celeryvale was liable for the rent due up to that time, the value of the trailer, and any interest on the value until it was paid in full. Value was set by the table of stipulated loss percentages.

Default included the failure to make any rent payment when due, encumbrance of the property, insolvency, bankruptcy, or any other default not cured within ten days after notice of default was mailed by Trailmobile. On default, Trailmobile had the right to repossess and sell the trailers. Celeryvale was liable for rent already due, the rent for the remainder of the lease, and Trailmobile's costs and attorney's fees. Celeryvale would be given credit against the debt for the net proceeds from the sale of repossessed trailers.

### Discussion

The trustee attached some significance to the execution of the sales orders. However, the order forms were merely a preliminary step in the lease transaction. They were essentially offers by Celeryvale to lease the trailers from Trailmobile. The parties did not intend that the order forms would be their contract except for the trailer specifications and the kind of lease. The fact that sales order forms were used to begin the lease transaction is of little relevance to the question of whether the lease was intended for security, though some facts revealed by the forms may be relevant.

Two sections of the Uniform Commercial Code as adopted in Tennessee provide that a lease which has the effect of a secured sale is to be treated as a security agreement and the secured transaction is to be governed by Article 9 of the UCC. Tenn. Code Ann. §§ 47–1–201(37) & 47–9–102. The effect of a lease cannot be determined by considering only the terms of the lease. The lease will not reveal the outside facts

regarding the leased goods, the lessor, and the lessee that indicate whether or not the lease is really a secured sale. The parties may not intend to enforce or abide by all the provisions of the lease and may have unwritten agreements concerning the leased goods or the meaning of the lease. Thus, the court cannot be restricted to the terms of the lease in determining whether or not it is intended for security.

UCC § 1–201(37) provides some guidance for deciding whether a lease is intended for security:

> Whether a lease is intended as security is to be determined by the facts of each case; however (a) the inclusion of an option to purchase does not of itself make the lease one intended for security and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Though the operation of an option to purchase may be the critical fact, the courts have considered numerous other facts as indicative of whether or not a lease is intended for security.

> Even if there is no purchase option or the purchase option is not for a nominal consideration, the lease may still be "intended for security" under 1–201(37). Courts take into account a wide variety of other factors in making their determination. Of note is that courts consider the lessor's status as financer to be relevant. So, too, such factors as whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments; the risk of loss or damage is on the lessee; the lessee is to pay for taxes, repairs and maintenance; there are default provisions governing acceleration and resale; a substantial, non-refundable deposit is required; the goods are to be selected from a third party by the lessee; the rental payments are equivalent to the cost of the goods plus interest; the les-

sor lacks facilities to store or retake the goods; the lease is discounted with a bank; warranties normally found in a lease are excluded; the goods are fixtures impractical to move. This list is not exhaustive. Nor is any one factor conclusive standing alone. Each transaction must be viewed on its facts, bearing in mind the Code's abhorrence of secret liens....

J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code 882–83 (2d ed. 1980).

The court can probably say, without much risk of error, that the lease in question put many obligations of ownership on Celeryvale and gave Trailmobile rights and obligations essentially like those that a secured seller would have. Furthermore, Trailmobile calculated the value of the investment tax credit, the rent paid in advance, the monthly rental payments, and the residual value of the trailers so that the profit on the lease should have been about the same as the profit on a secured sale. The lease did not give Celeryvale the right to return the trailers before expiration of the lease term but also did not require Celeryvale to exercise the purchase option. These facts are not enough to make the lease a lease intended for security without considering the effect of the option. *In re Winston Mills, Inc.*, 6 B.R. 587, 598, 2 C.B.C.2d 1267, 1280. (Bankr.S.D.N.Y.1980) (interpreting Tennessee law).

■ An option to purchase at the end of the lease for the fair market value of the leased goods is consistent with a true lease, but does not automatically save the lease from being a lease intended for security. *In re Coors of the Cumberland, Inc.*, 19 B.R. 313, 33 UCC Rep.Serv. 241 (Bankr.M. D.Tenn.1982); *In re Winston Mills, Inc.*, cited above.

The proof may show that the goods will have no market value at the end of the lease and will be abandoned or transferred to the lessee for no additional payment or for a minuscule payment that is clearly nominal consideration. This is likely to be true for goods that are near the end of

their useful life and have little or no salvage value. In such a situation the option to purchase for fair market value is a sham that does not prevent the lease from being a lease intended for security.

■ The facts in this case do not fit that pattern. At the end of the lease the trailers should have been worth at least about 15% of their original selling price. Trailmobile regularly received about 15% of the original price for trailers sold at the end of eight year leases. It did not automatically transfer title to a lessee for no additional consideration or for a minuscule amount. It might have accepted less than the true fair market value in order to maintain customer goodwill, but it would not automatically accept the estimated residual value of 10% of the original price. The option provided that independent appraisers would set a price but Celeryvale and Trailmobile had to agree on a price for the exercise of the option. This did not require Trailmobile to automatically accept less than the appraised value. Indeed, it should have encouraged Trailmobile not to cut much off the appraised value. Mr. Mowery's testimony also supported a wholesale value at the end of the lease of about 10% to 18% of the original price ($3,000 to $5,000). The court is of the opinion that Celeryvale could have exercised the option for about $4,000 to $5,000 per trailer. Though the average fair market value might have been slightly higher, the court believes that Trailmobile would accept less, and the amount that Trailmobile would accept is the true measure of fair market value for purposes of the option. In any event, $4,000 to $5,000 as an average option price is not so small as to be obviously a nominal consideration.

In cases like this, the courts have had a difficult time determining whether the option price is a nominal consideration.

In applying the economic realities test, some courts state that if the amount the lessee must pay to exercise his option is roughly equal to the fair market value of the asset at that time, the transaction is not a secured sale.... Other courts have analyzed the problem in terms of percentages: if the option price is 25% or more of the total list price, the "lease" is not one intended for security.

The econominc realities test may be interpreted as an effort to determine whether the amount paid by the "lessee" is merely "nominal," in which event the deal would be a secured transaction under 1–201(37). Courts are not agreed on how to determine what is "nominal". Thus, for example, some courts measure the option price against the original price, with results not readily reconcilable.... 

White & Summers, cited above, at 881–82.

An economic realities test, as mentioned in the above quotation, makes sense, if the courts can be adequately informed of the economic realities. When the lessee comes to the end of the lease and the option price is not obviously low, the lessee should look back and look ahead in deciding whether to pay the option price.

The lease saved Celeryvale about $11,000 per trailer in monthly payments compared to an installment sale contract. At the end of the lease Celeryvale could become the owner by paying another $4,000 to $5,000 per trailer. This looks like the cheapest way to buy the trailers. By giving up an investment tax credit worth nothing to it, Celeryvale could save $11,000 on a trailer over the term of the lease and still acquire it for a balloon payment of less than $11,000 at the end of the lease.

The court is of the opinion, however, that a lessee should pay more attention to the future in deciding whether to exercise the option in a situation like this. Why should a lessee pay $4,000 at the end of a lease to acquire a used trailer that may not be worth $4,000 for use and parts? Even if the trailer is worth about $4,000, buying it for $4,000 is not a bargain. In this kind of situation, *nominal* consideration should mean that the leased equipment is worth considerably more to the lessee for future use, salvage, or resale than the amount of the option price.

From Celeryvale's point of view, the trailers would have been about at the end of their useful life for the kind of hauling Celeryvale did. A lower option price, 10% or less of the original price, might have made the trailers more worth the risk of buying. The risk was increased by the all-or-none option that required Celeryvale to buy groups of trailers rather than specific trailers, but this risk could have been reduced some by bargaining over the price. In any event, Celeryvale faced a difficult question of value at the end of the lease, rather than a situation in which exercise of the option would obviously be a good deal.

From Trailmobile's point of view, it probably preferred to sell trailers to the lessees at the end of long term leases, but the proof did not show that it gave lessees a big break on the price. Trailmobile had the facilities somewhere in its related corporations to retake leased trailers and would retake them.

The court concludes that the option was not an option for nominal consideration and that the lease is not a lease intended for security.

■ There remains a question concerning the refrigeration units. The trustee contends that they were not "accessions" to the trailers within the meaning of that term such that a perfected security interest in the trailers would automatically apply to the refrigeration units.

The court agrees with the trustee that the refrigeration units were not accessions to the trailers. A refrigeration unit is made up of the cooling apparatus (compressor, condenser, etc.) and a small diesel engine that powers it. The unit is bolted into a hole in the trailer with six to eight bolts. It can be removed in about two hours with no damage to it and no damage to the trailer, other than leaving the empty hole. Another unit, even a unit of a different make, can be easily substituted, since the units are a standard size. The trailer can also be used for dry hauling, without a refrigeration unit, by plugging the hole with plywood and sealing it. This can be done easily and for little money. The units

did not become so attached to the trailers that they were accessions. *IDS Leasing Corp. v. Leasing Associates, Inc.*, 590 S.W.2d 607, 27 UCC Rep.Serv. 1441 (Tex. Civ.App.1979).

If the refrigeration units were accessions to the trailers then Trailmobile would in effect be the owner of the units and its rights would be superior to the trustee's rights. Since the refrigeration units were not accessions, the question arises whether the lease can be a true lease as to the trailers but a lease intended for security as to the refrigeration units.

The court's previous finding as to the option price of the trailers at the end of the lease was based on the trailers still having the refrigeration units and the units being in working condition. Since the effect of the option is the critical fact and the option applied to the trailers with the refrigeration units, the court thinks that the lease should be treated as a true lease as to both the trailers and the refrigeration units.

Furthermore, even if the refrigeration units are considered separately, the evidence does not clearly show that the lease was intended for security as to them. Mr. Triplett testified that the units should have cost $8,000 to $9,000 new. They were bought separately by Trailmobile and installed before the trailers were delivered. The units for the twenty trailers leased in 1980 were bought from and installed by RFG, a Carrier dealer. Mickey Miller was a subdealer for RFG and arranged the purchase. Mr. Miller has been in the business of buying, selling, and rebuilding refrigeration units since 1978. He testified that an eight year old unit in working condition is worth $1,000 to $1,500 and not in working condition is worth $700 to $1,000. Mr. Mowery testified that a unit has a junk value of $200 to $700. Mr. Miller testified that a unit has a useful life of six to eight years but after that it is too expensive to recondition. In six to eight years a unit would have to be reconditioned two or maybe three times. The gist of this is that an eight year old unit in working condition probably will have been reconditioned two

or three times and will have enough useful life and salvage value after that to make it worth $1,000 to $1,500 retail. An option price of $1,000 to $1,500 would be large enough to impose on Celeryvale a difficult economic decision as to whether to buy the trailers and units. If some of the units did not work, this would lower the average option price for a group of trailers but this does not mean the option price would be a nominal amount. Thus, the court concludes that the lease is not a lease intended for security as to either the trailers or the refrigeration units.

The court will enter an order accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.