In re EDISON BROTHERS STORES, INC., et al., Debtors.

Bankruptcy No. 95–1354 (PJW).

United States Bankruptcy Court, D. Delaware.

April 3, 1997.

Laura Davis Jones, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Harvey R. Miller, Richard P. Krasnow, Weil, Gotshal & Manges L.L.P., New York City, T. Ray Guy, Martin A. Sosland, Weil, Gotshal & Manges L.L.P., Dallas, TX, for Debtors.

Clifton R. Jessup, Jr., Bruce H. White, Dixon & Jessup Ltd., L.L.P., Dallas, TX, Patricia Pyles, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, for United of Omaha Life Insurance Company.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This is the Court's ruling with respect to United of Omaha Life Insurance Company's ("United") motion for order requiring Edison Brothers Stores, Inc. ("Debtor") to timely perform its obligations under a lease agreement between Debtor and ParcTec, Inc. ("ParcTec"), the predecessor in interest of United, and for assumption or rejection of the lease agreement. In response to the motion, Debtor takes the position that the lease agreement is not a true lease but a security agreement evidencing a sale of personal property to Debtor. Trial of this matter was conducted in September 1996. For the reasons stated below, I find the lease agreement to be a true lease and I will therefore grant the motion.

### JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b) as a matter arising under 11 U.S.C. § 365. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) as a matter involving the administration of the estate. The matter is before the Court pursuant to the July 23, 1984 Omnibus Order of the United States District Court for the District of Delaware, referring bankruptcy matters to this Court for hearing and determination.

### FACTS

The issue before me is whether Debtor obtained certain Atrium point of sale equipment through a transaction constituting a true lease or a disguised secured transaction. If I find that the transaction should be, pursuant to Uniform Commercial Code ("UCC") § 1–201(37), characterized as a secured transaction, Debtor may retain possession of the Atrium equipment by bifurcating United's claim into secured and unsecured components, see 11 U.S.C. § 506(a),[1] and cramdown

---

1. Reference to the Bankruptcy Code, 11 U.S.C. § 101 et seq., are hereinafter cited as "§ _____."

§ 506(a) provides:
 An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under sec-

tion 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest

the secured portion of the claim to the current fair market value of the equipment, *see* §§ 1123(b)(5); 1129(b)(2)(A).[2] On the other hand, if I find that the transaction is, as titled by certain written agreements, a true lease, Debtor must timely perform under § 365(d)(10) and may only retain the equipment by assuming the lease agreement and complying with § 365(b)(1).[3]

On November 3, 1995, Debtor (together with its 65 affiliates) filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Debtor is engaged in the business of selling men's and women's fashion apparel and footwear. As of November 3, 1995, Debtor operated more than 2,600 retail stores. Each of the Debtor's stores utilizes one or more point of sale cash registers for processing retail sales. Since the petition date, Debtor has reduced its operations to approximately 1900 retail stores. (Tr. 250)

In early 1990, Debtor began to examine its options for upgrading the point of sale cash registers in its various stores by acquiring new registers and replacing most of those that were in its stores. (United Ex. 3; Tr. 141) In selecting new cash registers, Debtor considered three or four major vendors who could provide Debtor nationwide services. (United Ex. 3; Tr. 143) After its preliminary evaluation, the Atrium registers manufactured by Fujitsu–ICL Systems ("Fujitsu") was the Debtor's first choice. (United Ex. 3; Tr. 146) Subsequently, in 1991, Debtor acquired a number of the Atrium registers to "pilot" the new system and in late 1992, it

---

or the amount so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

2. § 1123(b)(5) provides:

Subject to subsection (a) of this section, a plan may—
(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.
§ 1129(b)(2)(A) provides:
For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides—
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
· (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims.

3. § 365(d)(10) provides:

The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based or [sic] the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.
§ 365(b)(1) provides:
If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
· (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.

began to place its old registers with the Atrium registers. (Tr. 146)

In replacing the old registers with the Atrium registers, Debtor had an option either to lease or to purchase the registers. (Tr. 147) In determining whether to lease or purchase, Debtor conducted numerous cost-benefit analyses of leasing versus purchasing. (Debtor Exs. 53, 54, 60; United Ex. 5; Tr. 147)

In 1992, Debtor seemed to have become more attracted to the idea of leasing. According to the interoffice memoranda dated March 25 and August 31, 1992, Debtor's officers who were responsible for upgrading the registers frequently referred to the proposed acquisitions of the Atrium registers as "leasing arrangements." (United Exs. 7–8)

On or about September 30, 1992, ParcTec and Debtor entered into Lease Agreement No. EBS–101 (the "Lease Agreement") covering certain Atrium registers to be installed over a period of about a year with each installment to be evidenced by an equipment schedule. This resulted in the execution of 14 separate Equipment Schedules (the "Schedules") which became incorporated as a part of the Lease Agreement. Debtor was designated as the "lessee" in the Lease Agreement and ParcTec was designated as the "lessor." ParcTec's purchase of the Atrium registers from Fujitsu was financed by ParcTec's issuance of two non-recourse promissory notes to United in the aggregate amount of $7,032,757. (United Exs. 23, 27) The obligations under the notes are secured by two security agreements between ParcTec and United. (United Exs. 24, 28) The agreements grant United security interests in the Atrium registers and assign all of ParcTec's rights under the Lease Agreement, as supplemented by the Schedules. The total purchase price of these Atrium registers, as presumably indicated in the invoices attached to the promissory notes (and also attached to the Schedules) was $7,378,-

449. Debtor consented to the grant of the security interests as well as the assignment of ParcTec's interests. (United Exs. 25, 29)

Pursuant to the Lease Agreement, each Schedule incorporates all of the terms and conditions of the Lease Agreement. Pursuant to the Lease Agreement, besides the quarterly rental payments specified in the Schedules, the lessee is obligated to preserve the physical condition of the leased equipment and to return the equipment at the expiration of the lease term in the same condition as when the lessee received it, less normal wear and tear. (¶ 15) Additionally, the lessee must pay or reimburse to the lessor all applicable taxes and fees (¶ 5), maintain insurance on the leased equipment (¶ 10), indemnify the lessor against any liabilities (¶ 19), and pay all maintenance expense (¶ 9).[4]

The Lease Agreement further provides that the lessee must pay for the cost of returning the equipment at the end of the lease term. (¶ 11) It also provides that upon the occurrence of an event of default, the lessor can take possession of the Atrium registers and sell them "free and clear of any rights of Lessee and without any duty to account to Lessee for such action or inaction or for any proceeds with respect to thereof." (¶ 7)

The Schedules provide for a lease term of 20 quarters (5 years) with quarterly rental payments aggregating $408,247 per quarter (the "quarterly rent"). Pursuant to the various commencement dates set forth in the Schedules, the five-year lease terms expire beginning in 1998 and ending in 1999. At the end of the initial lease term, Debtor has an option to renew for an additional term of not less than 12 nor more than 60 months, for an exercise price equal to the fair rental value of the applicable equipment (the "fair market value renewal option"). Notwithstanding this fair market value renewal op-

---

**4.** According to a commentator, this type of lease agreement is a net lease which "obligates the tenant for the payment of all or a portion of the landlord's expenses relating to the ownership and operation of the leased premises." He distinguishes the net lease from a gross lease, under which the tenant pays nothing but the agreed rent and the landlord pays all expenses of the leased property. *See* John S. Hollyfield, *"Net Leases: How Net Is Net?," Commercial Leases: Selected Issues in Drafting and Negotiating During Troubled Times,* C845 ALI–ABA 117, 119 (1993).

tion provision, the Schedules state that the rent for the first 12 months of any additional term shall be $1. As an alternative to the renewal option, Debtor has an option to purchase the equipment at the end of the initial term of each Schedule, for an exercise price equal to the fair market value of the applicable equipment (the "fair market value purchase option"). The Lease Agreement defines the fair market value as:

> the value ... which would be obtained in an arms length transaction between and [sic] informed and willing buyer-user under no compulsion to buy and an informed and willing seller under no compulsion to sell. If the parties cannot agree on the Fair Market Value of the Equipment, the parties shall each select an independent appraiser knowledgeable about the Equipment and the appraisers shall agree upon and select a third such appraiser. The Fair Market value of the Equipment shall be the average of the independent written appraisals submitted by each of the three appraisers. The parties shall each pay one-half of the total cost of determining the Fair Market Value.

(¶ 21).

From October 1992 when the installation of the Atrium registers commenced, until August 1996, Debtor treated its acquisition of the Atrium registers as an operating lease on its financial books and records. Debtor's former chief information officer, Roger Koehnecke ("Koehnecke"), testified that Debtor intended the acquisition to be an operating lease. (Tr. 125) In late August 1996, however, after United had filed the subject motion in April 1996, a decision was made by Debtor to change its treatment of the Lease Agreement for accounting purposes from an operating lease to a financing lease. (Debtor Ex. 43)

Since the commencement of its Chapter 11 case, Debtor has not paid the quarterly rent other than a partial payment covering the period from November 3 to December 1, 1995. Although neither party has submitted the exact figure, it appears that the aggregate default rentals (without interest or late charges) owed to United, accrued until March 1, 1997, is $2,041,235.

## DISCUSSION

*Applicable Statutory and Case Law*

■ Pursuant to § 365(d)(10), Debtor is required to "timely perform all of the obligations of the debtor ... arising from or after 60 days after the order for relief in a case under Chapter 11 of this title under an unexpired lease of personal property ... until such lease is assumed or rejected...." Thus, as United contends, if the Lease Agreement constitutes a true lease, Debtor must perform its obligations thereunder until it is assumed or rejected. If, on the other hand, the Lease Agreement is found to be a security agreement as asserted by Debtor, then § 365 does not apply.

■ The legislative history of § 365 states that the determination of whether a transaction constitutes a true lease or a disguised secured transaction should be governed by state law. *See In re Continental Airlines, Inc.*, 932 F.2d 282, 294 (3d Cir.1991) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 314, S.Rep. No. 95–989, 95th Cong., 2d Sess. 26, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5812, 6271). The parties agree that the choice of law provision found in the Lease Agreement, which provides it will be governed by the law of New York, is controlling. (Doc. # 2121 at 9; Doc. # 2122 at 10)

The determination of whether the Lease Agreement between United and Debtor is a true lease or a disguised secured transaction is governed by § 1–207(37) of the New York UCC. The current version of § 1–201(37) of the New York UCC, effective June 30, 1995, provides in pertinent part:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> > (a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement, or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For purpose of this subsection (37):

(a) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(b) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(c) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

N.Y.U.C.C. § 1–201(37) (McKinney Supp. 1996) (effective June 30, 1995).

The parties are, however, in agreement that the 1992 version of the New York UCC should apply to the Lease Agreement since it was executed prior to the effective date of the new statute. (Doc. # 2121 at 9; Doc. # 2122 at 10) Notwithstanding such acknowledgment, United suggests, and Debtor does not dispute, that this Court should also consider the current version of the New York UCC since the applicable case law interpreting the 1992 statute was codified in the current UCC and therefore, the current statute is instructive. (Doc. # 2438 at 3; Doc. # 1428 at 6–7).[5] Furthermore, I do not limit

---

**5.** *Cf. Basic Leasing, Inc. v. Paccar, Inc.*, 1991 WL 117412, *4 (D.N.J.1991) (noting that the new UCC § 1–201(37), although not adopted in New Jersey, is helpful in court's analysis since it clarified the case law and dispelled some of the uncertainty regarding the interpretation of the old version); *Woodson v. Ford Motor Credit Co. (In re Cole),* 114 B.R. 278, 282 (N.D.Okla.1990) (affirming bankruptcy court's retroactive application of the amended UCC § 1–201(37) since the

my discussion to the 1992 version of the statute since the current version has been relied upon by the parties.[6] For the same reason, although I only cite to the New York UCC, the cases I rely upon are not limited to the New York UCC.[7]

The 1992 version of New York UCC § 1-201(37) provided:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

N.Y.U.C.C. § 1-201(37) (repealed).

■ The question of whether a lease is intended as a security agreement is to be determined based upon the facts of each case. *See International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 751 (2d Cir.1991); *In re Pan Am Corp.*, 130

B.R. 409, 413 (S.D.N.Y.1991); *All Good Leasing Corp. v. Bimco Indus. Inc.*, 143 A.D.2d 788, 533 N.Y.S.2d 336, 337 (1988). Courts are required to examine the intent of the parties and the facts and circumstances which existed at the time the transaction was entered into. *See Pan Am Corp.*, 130 B.R. at 413 (citing *In re Air Vermont, Inc.*, 44 B.R. 440, 443 (Bankr.D.Vt.1984)); *In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465, 469 (Bankr.S.D.N.Y.1990) (interpreting Arizona law); *In re Chateaugay Corp.*, 102 B.R. 335, 343 (Bankr.S.D.N.Y. 1989). "Courts should look to the economic reality of the transaction, rather than to its form, in determining whether there has been a sale or true lease." *Pactel Fin. v. D.C. Marine Serv. Corp.*, 136 Misc.2d 194, 518 N.Y.S.2d 317, 318 (N.Y.Dist.Ct.1987). *See Pan Am Corp.*, 130 B.R. at 413; *Chateaugay Corp.*, 102 B.R. at 343.

In determining whether an agreement that purports to be a lease is instead a disguised security agreement, the majority of courts have focused on three factors: (1) whether the purchase option price at the end of the lease term is nominal,[8] (2) whether the lessee

court found that the amendment "merely clarified the factors that distinguish a lease from a secured transaction which already had been enunciated in various decisions"); *In re Bumgardner*, 183 B.R. 224, 229 (Bankr.D.Idaho 1995) (retroactively applying the amended version of UCC § 1-201(37) since the court found that the amendment was "intended to clarify, not change the law").

**6.** For instance, Debtor, in its post-trial answering brief, states that "[a]s set forth above under Section 1-201(37), a security interest may exist if the rental payments meet or exceed the retail purchase price." (Doc. #2481 at 10). Although Debtor does not specify which version of the UCC it refers to, I gather that it must be referring to the current version of the New York UCC since (1) the old version does not mention the comparison between the rental payments and the purchase price of the goods being leased; and (2) conversely, the current version of the New York UCC § 1-201(37), subparagraph (a) of the second paragraph, notes that the comparison between the present value of the rental payments and the fair market value of the leased goods at the time the lease is entered into is not necessarily a useful indicator. Debtor also relies on the current version of the New York UCC when it asserts that "[u]nder the language of Section 1-201(37), and its interpretation by courts, two other factors must be considered: whether the useful life of the equipment is less than or equal

to the terms lease...." (Doc. #2481 at 16). Since the old version does not mention the "useful life" of the leased equipment and since the current version considers the "useful life" (or "economic life" to be more exact) of the equipment as an indicator, Debtor obviously relies on the current version of UCC § 1-201(37).

**7.** Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant. *Cf. In re Murray*, 191 B.R. 309, 314 (Bankr. E.D.Pa.1996) (interpreting the amended version of UCC § 1-201(37)) (noting that since state statute is based on the UCC, decisions from other jurisdictions which interpret the same uniform statute are instructive); *In re Hispanic Am. Television Co.*, 113 B.R. 453, 456-57 (Bankr.N.D.Ill. 1990) (noting that § 1-201(37) of the UCC is identical in New York and Illinois and that the case law from both states is relevant).

**8.** *See e.g., Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258, 1261 (7th Cir.1991) (interpreting New York law); *Jahn v. M.W. Kellogg Co. (In re Celeryvale Transp., Inc.)*, 822 F.2d 16, 18 (6th Cir. 1987), *aff'g* 44 B.R. 1007 (Bankr.E.D.Tenn.1984); *In re Marhoefer Packing Co.*, 674 F.2d 1139, 1144 (7th Cir.1982); *National Equip. Rental, Ltd. v. Priority Elects. Corp.*, 435 F.Supp. 236, 238-39 (E.D.N.Y.1977); *In re Herold Radio & Elecs.*

is required to make aggregate rental payments having a present value equaling or exceeding the original cost of the leased property,[9] and (3) whether the lease term covers the total useful life of the equipment.[10]

### Purchase Option Price

Under the 1992 New York UCC § 1–201(37), the most significant factor that indicates a disguised security agreement, not a true lease, is where the option price to purchase the leased equipment at the end of the lease term is nominal. If the lease agreement explicitly provides that the lessee has an option to purchase the leased goods for nominal consideration (e.g., for $1), the agreement is presumed to be a disguised security agreement. *See Orix Credit Alliance,* 946 F.2d at 1261; *P.W.L. Invs.,* 92 B.R. at 683; *Farrell,* 79 B.R. at 303; *Winston Mills,* 6 B.R. at 597; *BJL Leasing Corp. v. Whittington, Singer, Davis and Co.,* 204 N.J.Super. 314, 498 A.2d 1262, 1264–65 (App. Div.1985). On the other hand, if the lessee can exercise the option only by paying the fair market value of the property at the conclusion of the lease term, an inference is created that the option price is not nominal. *See Celeryvale Transp.,* 822 F.2d at 18; *The Answer—The Elegant Large Size Discounter,* 115 B.R. at 468; *Farrell,* 79 B.R. at 303; *Winston Mills,* 6 B.R. at 597. "That infer-

ence, however, can be rebutted if the fair market value of the property is shown to be negligible." *Farrell,* 79 B.R. at 303. *See Celeryvale Transp.,* 822 F.2d at 18; *Beker Indus.,* 69 B.R. at 941; *National Equip. Rental,* 435 F.Supp. at 239; *Winston Mills,* 6 B.R. at 597.

An option to purchase at the end of the lease for the fair market value of the leased goods is consistent with a true lease, but does not automatically save the lease from being a lease intended for security.

The proof may show that the goods will have no market value at the end of the lease and will be abandoned or transferred to the lessee for no additional payment or for a minuscule payment that is clearly nominal consideration. This is likely to be true for goods that are near the end of their useful life and have little or no salvage value. In such a situation the option to purchase for fair market value is a sham that does not prevent the lease from being a lease intended for security.

*Celeryvale Transp.,* 44 B.R. at 1013–14 (citations omitted). Therefore, even if the lease agreement provides that the lessee has an option to purchase the leased property for its fair market value at the end of the lease term (as is the case before me), it may still indi-

---

*Corp.,* 218 F.Supp. 284, 285–86 (S.D.N.Y.1963); *In re Hardy,* 146 B.R. 206, 209 (Bankr.N.D.Ill. 1992); *Hispanic Am. Television,* 113 B.R. at 459; *In re Farrell,* 79 B.R. 300, 303 (Bankr.S.D.Ohio 1987); *Triple B Oil Producers, Inc. v. Puder, (In re Triple B Oil Producers, Inc.),* 75 B.R. 461, 463 (Bankr.S.D.Ill.1987); *NYNEX BISC v. Beker Indus. Corp. (In re Beker Indus. Corp.),* 69 B.R. 937, 940 (Bankr.S.D.N.Y.1987) (interpreting Connecticut law); *Jahn v. M.W. Kellogg Co. (In re Celeryvale Transp., Inc.),* 44 B.R. 1007, 1013–14 (Bankr.E.D.Tenn.1984); *In re Winston Mills, Inc.,* 6 B.R. 587, 598 (Bankr.S.D.N.Y.1980) (interpreting Tennessee law); *J.L. Teel Co. v. Houston United Sales, Inc.,* 491 So.2d 851, 858–59 (Miss.1986); *Pactel Fin.,* 518 N.Y.S.2d at 318–19; *Guardsman Lease Plan, Inc. v. Gibraltar Transmission Corp.,* 129 Misc.2d 887, 494 N.Y.S.2d 59, 63 (N.Y.Supr.Ct.1985).

**9.** *See e.g., Orix Credit Alliance,* 946 F.2d at 1262; *Citi–Lease Co. v. Entertainment Family Style, Inc.,* 825 F.2d 1497, 1500 (11th Cir.1987); *Marhoefer Packing,* 674 F.2d at 1145; *Hardy,* 146 B.R. at 209; *Hispanic Am. Television,* 113 B.R. at 462; *Chase Leasing Co. v. P.W.L. Invs. (In re*

*P.W.L. Invs.),* 92 B.R. 680, 682 (Bankr.W.D.Tex. 1987); *Triple B Oil Producers,* 75 B.R. at 463; *J.L. Teel,* 491 So.2d at 858; *O.P.M. Leasing Servs., Inc. v. Homestead Fabrics, Inc.,* 1976 WL 23728, *6 (N.Y.Sup.Ct.1976). *But see infra* note 23.

**10.** *See e.g., Celeryvale Transp.,* 822 F.2d at 19; *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482, 1485 (9th Cir.1986); *Marhoefer Packing,* 674 F.2d at 1145; *In re Cress,* 106 B.R. 246, 251 (D.Kan.1989); *In re Telemax Corp.,* 1973 WL 21427, *5–6 (S.D.N.Y.1973); *Hardy,* 146 B.R. at 210; *The Answer—The Elegant Large Size Discounter,* 115 B.R. at 469; *Hispanic Am. Television,* 113 B.R. at 461–62; *Beker Indus.,* 69 B.R. at 943; *J.L. Teel,* 491 So.2d at 858. *Cf.* New York UCC § 1–201(37) (McKinney Supp.1996) (providing that "a transaction creates a security interest if the consideration the lessee is to pay the lessor. . . . is an obligation for the term of the lease not subject to termination by the lessee[ ] and . . . the original term of the lease is equal to or greater than the remaining economic life of the goods").

cate that a security arrangement was intended if the remaining value of the property at the end of the lease term can be shown to be negligible or insignificant.

■ The proper way to determine whether an option price is nominal is to examine what the parties, at the inception of the transaction, anticipated the fair market value would be at option time.

Commentators support the conclusion that the date of the transaction, rather than a future date, is the more appropriate point to determine the adequacy of the option price....

> Intending a true lease, parties might at the outset select an option price that they believe will equal the fair market value of the property at the end of the lease. The value may be substantially higher or lower than their estimate when the lease ends. If the option were "nominal" at the conclusion of the lease (because the property had not depreciated as expected), but would have been equal to the fair price had the parties estimate proved true, should the agreement be termed a lease or security interest? We believe it should be termed a lease.

Parties make the agreement at the outset. It is only there that they have the common intention to create a lease or security agreement, and it is at that time we should measure the economic realities to determine their true intention.... The courts have not always been careful to distinguish between the predicted value established at the outset and the actual value to determine the economic realities; our view is supported by the newly proposed uniform law on leasing[,] U.C.C. Article 2A and the amendments to section 1–201 (307).

*In re Zaleha,* 159 B.R. 581, 586 (Bankr.D.Idaho 1993) (interpreting the amended version of UCC § 1–201(37)) (citations omitted).[11] Therefore, in the present case, if it can be shown that in 1992, the parties anticipated that the fair market value of the Atrium registers would be negligible or insignificant at the end of the lease term, I can find that the Lease Agreement is a disguised security arrangement.[12]

■ In this case, the fair market value of the Atrium registers at the expiration of the lease term was not shown to have been known in 1992 and cannot, in 1996, be conclusively determined.[13] Since the parties have

11. *Cf. Orix Credit Alliance,* 946 F.2d at 1262 (holding that "[a]n option price may also be found to be nominal where it is insubstantial in relation to the fair market value of the leased goods at the time the option arises as anticipated by the parties when the agreement was executed"); *Marhoefer Packing,* 674 F.2d at 1144–45 (noting that "in determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time as anticipated by the parties when the lease is signed"); *Triple B Oil Producers,* 75 B.R. at 463 (holding that if "the parties anticipated that the property would have significant market value at the time the option to acquire would be exercised, ... a [true] lease is indicated").

12. In determining whether an option price is nominal, courts have used three different methods: (1) comparison of the option price to the total rental payments; (2) comparison of the option price to the original purchase price of the equipment; and (3) comparison of the option price to the anticipated fair market value of the equipment at the end of the lease term. *See e.g., Orix Credit Alliance,* 946 F.2d at 1261–62; *Mar-*

*hoefer Packing,* 674 F.2d at 1144–45; *Percival Constr. Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166, 171 (10th Cir.1976); *National Equip. Rental,* 435 F.Supp. at 238–39; *Herold Radio,* 218 F.Supp. at 286; *Zaleha,* 159 B.R. at 586; *Hispanic Am. Television,* 113 B.R. at 459; *Beker Indus.,* 69 B.R. at 940.

13. This is not a case where the lease agreement explicitly provides a purchase option price. *Cf. National Equip. Rental,* 435 F.Supp. at 237; *Herold Radio,* 218 F.Supp. at 285; *Hardy,* 146 at 207; *Hispanic Am. Television,* 113 B.R. at 455; *BJL Leasing,* 498 A.2d at 1264; *Pactel Fin.,* 136 Misc.2d at 194, 518 N.Y.S.2d 317. Nor is this the case where we know, without speculation, the fair market value of the leased goods on the exercise date of the purchase option. *Cf. Farrell,* 79 B.R. at 303 (holding that "vehicles of this nature typically have a fair market value at the expiration of 48 months which is greater than a sum characterized as 'nominal'"); *Celeryvale Transp.,* 44 B.R. at 1014 (finding that "[a]t the end of the lease the trailers should have been worth at least about 15% of their original selling price"); *Winston Mills,* 6 B.R. at 598 (finding, upon summary judgment motion, that "there is evidence that upon sale of the equipment, the

not shown what was their anticipated (when they entered into the transaction) fair market value of the Atrium registers at the expiration of the Lease Agreement, I am not able to determine whether the Debtor's fair market value purchase option is nominal.

Where, as here, fair market value has not been determined through the negotiation process, courts are left with the unenviable task of making that determination. Such a determination can only be made, however, if ample evidence of that value is adduced.

*Beker Indus.*, 69 B.R. at 941. The record before me provides no credible evidence as to the projected fair market value of the Atrium registers on the dates Debtor will be entitled to exercise the purchase options.

As the party seeking to characterize the Lease Agreement as an instrument other than a lease, Debtor has the burden to produce some factual basis for the Court to find that the parties anticipated a nominal market value of the Atrium registers at the expiration of the lease.[14] Absent some plausible evidence showing that the parties expected the market value of the registers at the expiration of the lease term to be negligible, I cannot find that Debtor met its burden of proof. Debtor has failed to rebut the inference that the option price, designated as the fair market value purchase option, is not nominal.

Debtor attempts to satisfy its burden by positing evidence of the 1996 market values of the Atrium registers and projecting those values to the end of the lease term as nominal. In support of this position, Debtor points out that in 1996, when Debtor attempted to sell a number of the Atrium registers on three different occasions, it was only able to obtain $2,000 to $2,700 per register.[15] Debtor further points out that the September 1996 wholesale and retail values, estimated by the United's witness, were $1,600 to $2,000 and $2,400 to $2,600, respectively (Tr. 13–14), and argues that these values are consistent with its position that the Atrium registers have been having "a precipitous decline in value that will result in nominal, or zero, value for the machines after six years." (Doc. # 2481 at 23).

To illustrate the alleged rapid decline in value, Debtor submits a graph that shows three straight-line depreciations in the value of the Atrium registers. All three straight lines begin on December 8, 1992, where the initial value is designated as $6,500 and reach their zero values in three different points of time between January 1, 1998 and January 1, 1999. The slope of the three straight lines, indicating the rate of depreciation of the registers, appears to be based on two factors: (1) Debtors' 1996 experience in selling the Atrium registers and the amounts realized from those transactions, and (2) the opinion of United's witness as to the 1996 wholesale and retail values. (Doc. # 2481, Appendix B).

I find Debtor's depreciation illustrations inconclusive, if not irrelevant. Assuming that Debtor's suppositions are true (viz., that (a) the September 1996 market value of the Atrium registers was at most $2,000, (b) the

---

machinery was found to have little or no market value").

**14.** *See Celeryvale Transp.*, 822 F.2d at 18–19 (affirming lower court's finding that a true lease was intended since the bankruptcy trustee, who sought to characterize the lease agreement as a lease intended for security, failed to show that the option price was nominal and that entire useful life of the equipment would have been expended during the eight-year lease term); *Murray*, 191 B.R. at 316 (holding that debtor, who sought to characterize the lease agreement as a disguised security agreement, had the burden to "prove that the Lease is other than what it purports to be"); *Zaleha*, 159 B.R. at 586 (holding that "where the transaction is denominated a lease, the burden is upon the debtor [who sought to characterize it as otherwise] to demonstrate

that the transaction is in fact a disguised security interest rather than a true lease"); *In re Aspen Impressions, Inc.*, 94 B.R. 861, 866 (Bankr. E.D.Pa.1989) (noting that burden of persuasion rests upon "the objector who desires to have the purported lease declared a security agreement"); *Farrell*, 79 B.R. at 303 (holding that debtor, who sought to characterize, had the burden to show that the purchase option would be nominal); *Bank of New York v. Olympia & York Florida Equity Corp. (In re Holywell Corp.)*, 51 B.R. 56, 58 (Bankr.S.D.Fla.1985) (noting that the party seeking characterization had the burden of showing that the option price would be nominal).

**15.** Debtor sold 2 Atrium registers on March 12 for $2,700, 22 registers on March 28 for $2,500, and 25 registers on May 24 for $2,000. (Debtor Ex. 34)

rate of depreciation in value was constant from 1992 to 1996, and (c) the value of the registers will continuously decline at the same rate through the end of the lease term), they provide me with no assistance in deciding the precise issue before me, i.e, what in 1992 was the anticipated value of the Atrium registers at the end of the lease term.

Moreover, even if today's market value of the registers is relevant, I do not see how that value is relevant in predicting the future market value of the registers unless we know that the straight-line depreciation depicted by Debtor reflects reality. Debtor's graph is based on an unsubstantiated assumption that the value of the registers will continuously decline at the same rate as they have supposedly been declining since 1992. As United correctly points out, there is no evidence which would indicate that the value of the Atrium registers drops off in a straight line. (Doc. # 2507 at 11) For all I know, the decline in value of these registers, after an initial sharp decline (like the value of a new automobile declines significantly as soon as it is driven away from the dealership), has leveled off and may not result in nominal value at the end of the lease term.

I also give little weight to Debtor's contention that the 1,500 Atrium registers that could be returned to the market at the end of the lease term would flood the market and therefore, would depress the market for the used Atrium registers. (Doc. # 2481 at 24) The testimony given by Debtor's two former employees in support of this contention is highly speculative, and is disputed by Unit-

ed's witnesses who testified that the growing international market for the used Atrium registers will be able to absorb the 1,500 registers that could be returned to the used terminal market in 1998–99.[16] (Tr. 11–12, 16, 348)

Lastly, there is insufficient evidence before the Court to support the Debtor's contention that technological obsolescence of the Atrium registers will further depress any remaining market for the registers in 1998–99. (Doc. # 2481 at 25) The gist of the Debtor's argument is that the Atrium registers, built around computer microprocessors, have suffered and will continuously suffer the same problem of technological obsolescence that has been experienced by the personal computer equipment industry, and therefore, by the end of the lease term, the registers will be useless. (Doc. # 2481 at 29–30)

Although I agree with Debtor that the Atrium registers share certain "hi-tech" features that can be found in personal computer equipment, it does not follow that these registers should be equated with the obsolescence characteristic of some personal computer equipment. I cannot agree with Debtor, nor is there any evidence to support (other than the self-serving testimonies rendered by Debtor's former employees) its position that the Atrium registers used in retail stores as cash registers (with ancillary functions of bar code scanning, inventory tracking and automatic card-swipe credit authorization processing) will grow obsolete in a way that some personal computer equipment do.[17] In any event, Debtor did not

---

**16.** Under the Schedules, the initial term of the Lease Agreement is five years. However, since Debtor has an option to renew the Lease Agreement for the sixth year for $1, the Lease Agreement may be viewed as having a six-year term. I note, however, that Debtor has only one renewal option—to extend for an additional term of not less than 12 months nor more than 60 months at fair market rental (subject to the $1 rental for the first 12 months). It is also worth noting that the renewal option is an alternative to the purchase option. Debtor has no right to exercise the purchase option if it exercises the renewal option. (¶ 21)

**17.** Debtor, in an attempt to highlight technological obsolescence of the subject equipment as an important factor distinguishing a true lease from

a disguised secured transaction, cites *In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465 (Bankr.S.D.N.Y.1990), in which the court characterized a lease agreement involving computer hardware equipment and trade fixtures as a disguised security arrangement. That case, however, is easily distinguishable from the case before me since the transaction before the court in *The Answer—Elegant Large Size* was primarily an acquisition of custom designed fixtures, not computer equipment. *See id.* at 469. In that case, the debtor acquired $1.8 million worth of trade fixtures (approximately three-fourths of the total property financed under the alleged lease agreement), many of which were custom designed for the debtor's store. *See id.* at 466–67. Since the fixtures were custom designed for the debtor's operations, they had no significant value to other potential users, and consequently, their

even establish a basis for concluding that personal computers in general, or any particular type of personal computer, experience useful life obsolescence in six years.

### Rental Payments Relative to Original Purchase Price

■ The second principal factor used to decide whether a true lease was intended is whether the lessee is required to make aggregate rental payments having a present value equaling or exceeding the purchase price of the subject property. *Hardy*, 146 B.R. at 209. *See Orix Credit Alliance*, 946 F.2d at 1262 (affirming district court's characterization of the lease before it as a conditional sale and agreeing with district court's conclusion that "the total rental payments may represent the fair market value of the trailers plus a financing charge") (applying "an implied interest rate of 13.6%"). The rationale behind this second factor is that if the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for the use of the leased goods and loss of their value; the lessor will receive a consideration that would amount to a return on its investment.

■ Here, Debtor contends that the second factor weighs in favor of finding that a secured transaction was intended since the Lease Agreement entitles the lessor to receive "more than 100% of the purchase price of the equipment within the first five years of the lease term." (Doc. #2481 at 11) In support of its contention, Debtor analyzes the rental payments as follows: Debtor notes that for the first 12 Schedules (Nos. 101–112), the lease factor is 5.54% and that 20 payments of 5.54% of the purchase price would result in payment of 110.80% of the purchase price. For the last 2 Schedules (Nos. 113–114), Debtor notes that the lease factor was reduced to 5.505% and that 20 payments of 5.505% of the purchase price would result in payment of 110.10% of the purchase price. Accordingly, Debtor concludes that the sum of the total rental payments alone exceeds the 100% of the purchase price. Debtor further argues that since ParcTec received "additional consideration from Edison, in the form of an initial, 'Interim' rent payment equal to one-half of the regular quarterly payment"[18] and since it also received another additional consideration of "2.1% of the purchase price [as] a

---

value, at the end of the lease term, was expected to substantially decline and to become nominal. *See id.* at 467, 469.

Moreover, with respect to the computer equipment, the debtor in that case, unlike Debtor in the present case, "never contemplated returning any of the computer equipment at the end of the term of the contract with [the lessor] because the computer equipment was regarded as essential to the ongoing operations of the Debtor." *See id.* at 467. Therefore, the court had a much easier time finding that the parties' anticipated value of the custom designed fixtures and the computer equipment was negligible and that the fair market value purchase option provision was illusory.

**18.** I disagree with Debtor's characterization of the interim rent as "additional consideration," implying that it was some type of additional up-front payment. The interim rent was, in fact, a reasonable rental payment to compensate ParcTec for Debtor's use of the Atrium registers for a period from the date the registers were installed to the date each rental obligation commenced.

Under the Schedules, the quarterly rent is "[p]ayable in arrears on the last day of the fiscal quarter commencing on the Commencement Date and quarterly thereafter." The Lease Agreement defines the "Commencement Date" as "the first day of the fiscal quarter following the fiscal quarter in which the Installation Date occurs, it being agreed that fiscal quarter shall commence on March 1, June 1, September 1 and December 1." (¶ 2) Consequently, the quarterly rent does not cover the Debtor's usage of the Atrium registers for the period between the Installation Date and the Commencement Date (the "interim rental period"). Therefore, in order to compensate ParcTec for the Debtor's usage of the registers during this interim rental period, the Schedules required Debtor to pay "[i]nterim rent amount of [one half of the quarterly rent] . . . on the Commencement Date."

I find that the interim rent was reasonable compensation for Debtor's usage of the Atrium registers during the interim rental periods. The number of days that Debtor had possession of the registers in the interim periods was as long as 87 days (Schedule 114) and as short as 1 day (Schedule 107). The average length of the 14 interim rental periods is 40.5 days, fairly close to one-half of a full fiscal quarter. Therefore, the interim rent in the amount of one-half of the

direct rebate" from Fujitsu, by the end of the lease term, ParcTec will have received more than 100% of the purchase price of the leased registers.[19] (Doc. #2481 at 10–11) Based on this analysis, Debtor concludes that a secured transaction was intended. However, Debtor's calculation does not take into consideration the time value of money. *Cf. Marhoefer Packing,* 674 F.2d at 1145 (noting that it must "factor[ ] in the interest rate over four years [of lease term] that would have been charged had Marhoefer elected to purchase the machine under a conditional sale contract").

■ The 1995 version of UCC § 1–201(37) and the pertinent case law authority (see note 9, p. 810 above) require not simply a comparison of the aggregate rental payments to the fair market value (purchase price) of the goods at the commencement of the lease, but a comparison of the present value of the aggregate rental payments to the fair market value.[20]

Here, Debtor did not offer evidence showing the 1992 value of the aggregate quarterly rents to be paid over the five-year term of the Lease Agreement. My analysis of the issue suggests that the 1992 value of the total rental payments does not exceed the purchase price of the Atrium registers covered by the Schedules.

I start with the issue of the appropriate discount rate for calculating present value. The 1995 version of UCC § 1–201(37) defines "present value" as:

"Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is ·determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

N.Y.U.C.C. § 1–201(37) (McKinney Supp. 1996). I have found no commentaries or case law which aid in the determination of how to select a "commercially reasonable rate." However, according to one of Debtor's internal memoranda, in August 1992, Debtor believed its borrowing cost on a six year loan from its bank lender to finance the purchase of the equipment would have been 9%. (United Ex. 8) Consequently, I believe a 9% discount rate for present value calculation may be considered an appropriate rate under the circumstances here.

quarterly rent was a reasonable estimation of the rent covering the interim rental periods.

**19.** Unfortunately, Debtor does not provide the Court with a calculation based on real numbers. Using real numbers, the Debtor's argument can be illustrated as follows. For the Schedules Nos. 101–112, the aggregate rental payment is $326,-535 per quarter, the sum of the 20 payments of which equals $6,530,700. The invoices attached to these Schedules indicate that the purchase price of the Atrium registers described in these Schedules was $5,894,124. Therefore, Debtor would argue that the sum of the total rental payments for the five-year period exceeds the purchase price by $636,576 or by 10.80%. Additionally, if one adds the interim rent ($163,267) and the manufacturer's rebate ($123,777), the total consideration that Debtor is obligated to make under the Lease Agreement would be even greater than·100% of the purchase price.

The same conclusion can be reached for the Schedules Nos. 113–114. Since the aggregate rental payment under these two schedules is $81,712 per quarter, Debtor is obligated to pay a sum of $1,634,240 over the period of five years. The purchase price of the Atrium registers de-

scribed in Schedules Nos. 113–114 was $1,484,-328. Therefore, Debtor would conclude that the sum of the total rental payments exceeds the purchase price by $149,912 or by 10.10%. Additionally, if one adds the interim rent ($40,856) and the rebate ($31,171), the total consideration that Debtor is obligated to make would also be greater than 100% of the purchase price.

**20.** It appears that some courts do not recognize the significance of the time value of money when they compare the purchase price of the leased goods with the aggregate rental payments. *See e.g., National Equip. Rental,* 435 F.Supp. at 239; *Leasing Service Corp. v. American Nat. Bank & Trust Co.,* 1976 WL 23674, *18–19 (D.N.J.1976); *Beker Indus.,* 69 B.R. at 942; *Guardsman Lease Plan,* 494 N.Y.S.2d at 64. In assessing the second factor, these courts mechanically added up all the rental obligations (including interim payments) payable by the lessee and compare it with the purchase price of the leased goods. Often the outcome was that the sum of the aggregate rental payments exceeded the purchase price. Based on this, these courts concluded, or confirmed their conclusions, that the purported lease agreements were disguised secured transactions.

As noted earlier, the total purchase price of the leased Atrium registers described in Schedules Nos. 101–114 was $7,378,451. Under the Schedules, Debtor is obligated to pay $408,247 per quarter for the period of five years.[21] By applying the discount factor of 9%, the 1992 value of these payments is $6,523,787.[22] Thus, based on this discount factor, the 1992 value of the 20 quarterly rental payments is substantially less than the purchase price. Even if we add, as Debtor contends, the interim rent of $204,124 (one-half of the quarterly rent of $408,247) and ParcTec's rebate of $154,947 (2.1% of $7,378,-451), the total present value received by ParcTec in 1992 (which is $6,882,858) is still less than the purchase price of $7,378,449.

▉▉▉ Given Debtor's apparent long-term relationship with its lending bank with reference to which it believed its borrowing rate would be 9%, one could argue that the appropriate commercially reasonable rate applicable to this type of transactions should be higher than 9%. Furthermore, it seems to me that the commercially reasonable rate should also reflect ParcTec's practices and policies regarding return on investment for such transactions and on that point no evidence was offered, although one would expect that such transactions would support a 9% or higher rate. Of course, since Debtor did not offer any credible evidence on this issue and since it bears the burden of proof on the matter, I find that it has not demonstrated that the 1992 present value of the rental payments is substantially equal to or greater than the 1992 purchase price of the Atrium registers and therefore, the transac-

tion should not be viewed as a disguised secured transaction under the second factor.

*Useful Life Versus Lease Term*

▉▉▉ The third principal factor focused on by the majority of courts is the useful life of the subject property. If the term of the purported lease approximates the useful life of the subject property, a secured transaction is suggested. See *Hardy,* 146 B.R. at 210; *Belcer Indus.,* 69 B.R. at 943 (citing *Marhoefer Packing,* 674 F.2d at 1145). As the Court of Appeals for the Seventh Circuit explained:

> An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of the lease is substantially equal to the life of the lease property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale.

*Marhoefer Packing,* 674 F.2d at 1145 (citation omitted).

Conversely, if the lessor expected a remaining useful life after the expiration of the lease term, it can be reasonably inferred that it expected to retain substantial residual value in the leased property at the end of the lease term and that it therefore intended to create a true lease. See *Cress,* 106 B.R. at 251.

I believe that the determination of whether the lease term covers the total useful life of the subject property is the better indicator in distinguishing a true lease from a disguised security transaction.[23] If the term of the lease is substantially equal to the useful life

As noted above, I do not agree with this approach.

**21.** Without taking into consideration the present value, 20 payments of $408,247 would be $8,164,940.

**22.** The present value factor of an annuity of $1 per quarter for five years at a discount rate of 9% per year (or 2.25% per quarter) is 15.98. See Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* AP6, Appendix Table 3 (4th ed. 1991). Therefore, 15.98 × $408,247 produces a present value of $6,523,787.

**23.** The second factor, the comparison between the present value of the rental payments and the purchase price, may not provide an accurate picture of the parties' intention.

Although the rental payments may reimburse the lessor's total capital outlay plus interest, where the property still possesses value at the term's end, the lessor may very well have intended to create a true lease situation where he will get the property back at the term's end and sell it for a substantial amount or refurbish and relet it.

*In re Loop Hospital Partnership,* 35 B.R. 929, 934–35 (Bankr.N.D.Ill.1983). Cf. N.Y.U.C.C. § 1–201(37) (McKinney Supp.1996) (stating that "[a] transaction does not create a security interest merely because it provides that ... the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into").

of the Atrium registers, it suggests that ParcTec did not expect the return of the registers, and therefore that it intended to create a secured transaction.

■ Here, the useful life of the Atrium registers should be determined as it existed at the time of the transaction since I am required to look to the economic reality of the transaction and to examine the facts and circumstances as they existed at that time. *See Pan Am Corp.*, 130 B.R. at 413; *The Answer—The Elegant Large Size Discounter*, 115 B.R. at 469; *Chateaugay*, 102 B.R. at 343. As one bankruptcy court noted:

> A lease extends for the useful life of the asset if the lessee is entitled to possess the leased property for a primary term and applicable renewal terms substantially corresponding to the *estimated useful life* of the property.

*Fruehauf Corp. v. Int'l Plastics, Inc. (In re Int'l Plastic, Inc.)*, 18 B.R. 583, 587 (Bankr. D.Kan.1982) (emphasis provided). *See also J.L. Teel*, 491 So.2d at 858 (holding that one of the inquiries in differentiating a true lease from a sale is to ask "[i]s the term of the lease roughly equivalent to the *expected useful life* of the equipment?") (emphasis provided).

The determination of the useful life based upon known facts and circumstances when the parties entered into the Lease Agreement is consistent with the earlier analysis of the adequacy of the option price under which I examined the parties' anticipated fair market value of the Atrium registers when they entered into the Lease Agreement. (See pp. ——————— above.) I see no reason why one should not determine the useful life prospectively, not retroactively, if it is appropriate to evaluate the adequacy of the option price prospectively.

■ This is particularly so if the leased equipment's useful life may be susceptible to future technological developments. It would be inappropriate to redefine the parties' intentions because of the fact that the expected useful life is shortened as a result of an unforeseen technological breakthrough.

■ Here, on the record before me, I find the useful life of an Atrium register was expected to be eight to ten years. As stated in an August 31, 1992 interoffice memorandum, Debtor's employee involved in the acquisition decision estimated that the useful life of an Atrium register was eight to ten years. He based his estimation on three specific references:

> [1] In considering a reasonable life for the [Atrium] registers I looked primarily to our own experience. Per discussion with Roger Koehnecke our existing registers were acquired over a period of several years from 1983 to 1986. If this population is replaced over the next few years it will have had a life ranging from seven to ten years. [2] Additionally, Roger believes that based on his experience with the registers an economic life of ten years is reasonable. [3] Finally, a professional appraisal performed in 1986, two years after the studied register were [sic] acquired, concluded that a remaining life of seven and one-half years was appropriate. Given that the subject lease is for new equipment and the probability we will be replacing some registers with a degree of remaining economic life, an estimated life for the new registers of between eight and ten years does not seem unreasonable.

(United Ex. 8) [24]

Debtor, in an effort to discredit its own internal memoranda, had Koehnecke testify as to his anticipated useful life of an Atrium register in 1992. Notwithstanding the Debtor's internal memoranda stating that he viewed the Atrium registers as having a ten-year economic life, Koehnecke now testifies that he always viewed this equipment as having a five-year economic life. (Tr. 152).

---

24. The same statement is set forth in a March 25, 1992 interoffice memorandum by the same employee. (United Ex. 7) These interoffice memoranda, stating the useful life of eight to ten years, were created in connection with Debtor's determination of whether for accounting purposes to treat the Lease Agreement as an operating lease or a capital lease. While this determination was not a determination of whether the Lease Agreement should be deemed a true lease or a financing agreement, the statements obviously are relevant since they are statements of fact or factual beliefs and bear directly on the issue at hand regardless of why they were made.

Koehnecke explains that he has no recollection opining that the useful life of the Atrium registers was ten years. He further implies that he must have been misquoted by the author since the statement—that he believed that based on his experience with the registers an economic life of ten years was reasonable—did not "sound like something [he] would have told" the author. (Tr. 193). In an effort to bolster his credibility, Debtor claims that in an internal memorandum authored by Koehnecke in January 26, 1990, he suggested a useful life of five years for the Atrium registers. (United Ex. 3; Doc. # 2431 at 32 n. 26).

In light of Debtor's numerous internal memoranda highlighting the Atrium registers as equipment having a useful life longer than eight years, I find Koehnecke's testimony not credible. As the August 31, 1992 internal memorandum states, the author's estimation of an eight to ten-year useful life of the Atrium registers was not based solely on Koehnecke's view. It is also based on two other independent sources, namely, Debtor's "own experience," and "a professional appraisal." (United Ex. 8)

Moreover, I do not view Koehnecke's January 26, 1990 internal memorandum as supporting his testimony for two reasons. First, the document was prepared in early 1990, almost two and half years prior to the execution of the Lease Agreement. It does not necessarily reflect Debtor's view of the anticipated useful life of the Atrium register when it entered into the Lease Agreement in September 1992. Secondly, and more importantly, the memorandum does not show that Koehnecke viewed the Atrium registers as having a five-year useful life; it merely shows that as a part of his analysis for selecting new registers, Koehnecke compared the cost of the Atrium register with the cost of a number of different registers manufactured by others, based on an assumption of a "five year cost of ownership" for all of them. (United Ex. 3)

Additionally, United's position that the parties' estimated useful life of an Atrium register in 1992 was eight to ten years is consistent with the testimony rendered by employees of Fujitsu and ParcTec, who attested that in 1992, each respective company's position as to the estimated useful life of the registers was seven to ten years or eight to ten years. (Tr. 19, 49).

Based on the record summarized above, I find that the estimated useful life of the leased property is certainly longer than six years, the term of the Lease Agreement assuming a 12 month renewal, and since two to four more years of the Atrium's useful life was expected to remain at the end of the lease term, I find that the third factor weighs in favor of finding that a true lease was intended.

*Other Factors*

Apparently recognizing the deficiency in its case dealing with the three principal factors governing the true lease versus security agreement issue, Debtor argues that since (1) Debtor was required to assume the risk of loss, to repair and maintain the leased registers, and to pay insurance and taxes, (2) the Lease Agreement provides the lessor with default remedies akin to those of a secured creditor, and (3) ParcTec's sole role in this transaction was that of a financier, as opposed to an owner/producer of the Atrium registers, the Court should find that the Lease Agreement is a disguised financing agreement. (Doc. # 2481 at 9) I disagree.

As Debtor admits, these factors should not be considered alone and are not conclusive standing alone. (Doc. # 2481 at 13) I place little weight on the fact that Debtor assumed many of the obligations associated with outright ownership of the equipment, namely, obligations to pay taxes, to pay insurances, to pay maintenance expense, to indemnify the lessor, and to assume all risks.[25] These factors "are necessarily

25. *See International Trade Admin.*, 936 F.2d at 750–51 (noting that the fact that these indicia of ownership are assumed by a lessee should not be viewed as indicative of financing transaction since lessors often "superficially" shift the costs of ownership to the lessee to assure their profits);

*Celeryvale Transp.*, 822 F.2d at 18–19 (noting that these obligations "frequently appear in valid true leases"); *Basic Leasing*, 1991 WL 117412, *4 (holding that "it makes sense that a lessee would provide insurance on the property while in possession of it under a lease; it seems perfectly

borne by one party or the other and therefore they reflect less the true character of the transaction than the strength of the parties' respective bargaining positions." *Orix Credit Alliance, Inc.*, 946 F.2d at 1262–63 (citing *Marhoefer Packing*, 674 F.2d at 1146). *See Murray*, 191 B.R. at 317; *Zaleha*, 159 B.R. at 584. Since "[t]he lessor is either going to include those costs within the rental charge or agree to a lower rent if the lessee takes responsibility for them," *In re Bumgardner*, 183 B.R. at 230 (quoting *Rainier Nat'l Bank v. Inland Mach. Co.*, 631 P.2d 389, 395 (Wash.Ct.App.1981)), I find that Debtor's assumption of these obligations is inconclusive in resolving the present issue.

Moreover, Debtor's own witness, Koehnecke, testified that these obligations are generally assumed by a lessee and such a practice is "the standard of the industry." (Tr. 126–27) This practice is also supported by the fact that Debtor assumed the same type of obligations when it executed certain other leases which Debtor continues to treat as true leases. On the date of the commencement of Debtor's Chapter 11 case, Debtor had four separate leases of the Atrium registers in effect—three of which were executed with ParcTec and one with LDI. Each of the three leases with ParcTec had been assigned to United, Republic National Bank, and MetLife. The LDI lease had been assigned to CIT. (United Ex. 16)

Debtor contests the characterization of the ParcTec lease assigned to United. Debtor does not, however, contest the characterization of the LDI lease assigned to CIT. Neither does Debtor contest the characterization of the ParcTec lease assigned to MetLife even though it shares the same Lease Agreement with the United lease. In fact, Debtor continues to make the rental payments under the LDI and MetLife leases as they become due. (Tr. 122–23, United Ex. 16).

Debtor, in justifying what appears to be its inconsistent characterizations of its leases, correctly points out that the material terms of the latter two leases are different from those of the United lease and thus, its characterizations of LDI and MetLife leases are not relevant. I agree with Debtor that there are certain differences between the United lease and the MetLife and LDI leases (such as, the length of the lease term, the types of the leased registers, the absence of the interim rent, and the difference in certain equipment exchange features).

However, it does seem to me that Debtor is taking inconsistent positions regarding the fact that Debtor has assumed those indicia of ownership as set forth in the Lease Agreement. For instance, in its answering brief, Debtor claims that the assumption of these obligations is one of many significant factors indicating a disguised security arrangement. (Doc. # 2481 at 8–9). In the same brief, however, Debtor takes the position that LDI and MetLife leases are true leases even though Debtor assumed the same indicia of ownership when it entered into these two true lease agreements. (Doc. # 2481 at 35–37). This supports my view that Debtor's assumption of these obligations is not particularly relevant in distinguishing a true lease from a disguised security agreement.

---

reasonable for a lessee to agree to undertake some of the risks of loss or damage while the lessee enjoys possession and use of the property. The same holds true for taxes and maintenance"); *Hardy*, 146 B.R. at 210 n. 5 (placing little weight on the fact that debtor has assumed all risks and paid all taxes on the leased goods); *Hispanic Am. Television*, 113 B.R. at 457 (holding that these terms, typical in a lease of personal property, merely "allocate the responsibilities both according to who most efficiently will bear them and the relative bargaining power of the parties"); *Aspen Impressions*, 94 B.R. at 868 (finding that "these factors are, at best, inconclusive of the issue as they can all legitimately appear in true leases"); *Farrell*, 79 B.R. at 304 (noting that these factors do not indicate an intent to create security interest since they "frequently appear in 'true leases' "); *P.W.L. Invs.*, 92 B.R. at 685 (holding that "these factors are essentially matters of contract negotiation"); *Triple B Oil Producers*, 75 B.R. at 465 (noting that "these factors are basically irrelevant as they can also appear in true leases, and merely add to the confusion in analyzing these cases"); *Celeryvale Transp.*, 44 B.R. at 1013 (holding that lessee's assumption of indicia of ownership "are not enough to make the lease a lease intended for security without considering the effect of the option"); *In re International Plastics, Inc.*, 18 B.R. 583, 588 (Bankr.D.Kan.1982) (noting that "such factors are less persuasive as they are essentially matters of contract negotiation").

In support of its position that its assumption of the indicia of ownership is a significant factor, Debtor cites a number of cases. I find these cases distinguishable from the matter before me. For example, in *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.*, 890 F.2d 108 (9th Cir.1989), the lessee argued that the lease agreement before the court was a true lease. In addition to noting the indicia of ownership factors, the court, in disagreeing with the lessee, held ·that the lease was a disguised security agreement because (1) the lessee's own witness, in his deposition, testified that the lessee "was to own [the leased equipment] at the end of the 60 month term" and because (2) the lessee's "whole law suit [was] premised on the existence of a sale contract" with the purported lessor. *See id.* at 116.

Likewise, in *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482 (9th Cir.1986), where the court found the purported lease a security arrangement, the purported lease placed the numerous indicia of ownership on the lessee and "gave [the lessor] the rights of a secured party under the Uniform Commercial Code upon default by [the lessee]." *See id.*, at 1485. However, the more important fact supporting the court's conclusion was that the ˙purported lessor's own evidence showed that it "did not anticipate regaining the use of the [alleged leased] equipment." *See id.* at 1485. Because the anticipated useful life of the equipment was the equivalent to the lease term and because the purported lessee had an option to purchase the equipment for a stipulated small purchase price—$20,000 versus the value of the equipment (at the time the agreement was entered into) of $416,000—the court concluded that the parties intended to create a security interest rather than a true lease. *See id.*

I also disagree with Debtor's assertion that the Lease Agreement provides ParcTec with default remedies akin to those of a secured creditor. Paragraph 7 of the Lease Agreement provides that upon the occurrence of an event of default, the lessor can, among other remedies,

sell any or all of the Equipment at public or private sale ... free and clear of any

rights of Lessee and without any duty to account to Lessee for such action or inaction or for any proceeds with respect thereof, [and/or] ... cause Lessee to ... pay ... an amount ... equal to (i) all past rent payments then due and owing, plus (ii) the Casualty Value [defined as "the aggregate of all rentals for the remaining term of the Lease plus 30% of the Vendor's list price of the Equipment on the execution date" in ¶ 10] of the Equipment ... reduced by in the event the Lessee has returned the Equipment to Lessor ..., the fair market sales value of the Equipment determined by independent appraisal or the actual net sales proceeds of a public or private sale of the Equipment[.]

(¶ 7)

In the event of default, therefore, one option that United has is to repossess the Atrium registers and sell them, without any obligation to pay any excess to Debtor. Additionally, United is entitled to the sum of (1) the past due rent, (2) the accelerated future rent, and (3) 30% of the Vendor's list price, minus the fair market value (or sales proceeds) of the repossessed registers. Since the default provision allows United to keep all the proceeds from a sale following repossession (without an obligation to account to Debtor for any possible equity in the registers) and since it entitles United to receive, not only the past due and the accelerated quarterly rents, but also an extra 30% of the vendor's list price (presumably, the purchase price of the Atrium registers paid by ParcTec), I find that the default provision provides United with a right greater than that given to a secured creditor under the UCC. *Cf. Beker Indus.*, 69 B.R. at 942 (noting that "[i]f this were a true lease, one would think that the lessor should be permitted to receive the full amount due from the lessee regardless of any disposition of the equipment subsequent to the termination of the lease").

Debtor, citing *Citi–Lease Co. v. Entertainment Family Style, Inc.*, 825 F.2d 1497 (11th Cir.1987) and *Guardsman Lease Plan, Inc. v. Gibraltar Transmission Corp.*, 494 N.Y.S.2d 59 (N.Y.Sup.Ct.1985), further claims that the fact that ParcTec was in-

volved solely as a financier suggests that a secured transaction was intended. In *Citi–Lease* the court was concerned with a "lease" of equipment for video games. This lease was for a 24 month term and the court found the significant facts that (a) the lessee was required to pay a substantial deposit upon acceptance of the lease, (b) the parties presented no evidence concerning the useful life of the leased equipment, and (c) the individual defendants in the case before it guaranteed the debtor's performance on the lease obligation. While I do not understand why the guarantee obligation would have any bearing on whether the transaction should be deemed a lease or a sale, I do find significant the other two factors which are absent in the case before me. The *Guardsman* case also found significant the fact that the lease required a third party guarantor. Since I do not understand the relevance of that factor to the issue of whether a transaction is a lease or a sale, the only distinguishing feature I find in the *Guardsman* case is that the court considered important the fact that the aggregate rentals exceeded the purchase price of the equipment without considering the present value of the rental payments, an approach which I believe is incorrect. In any event, given the limited analysis undertaken by the court in *Guardsman*, I do not find it helpful authority.

 I am of the view that the fact that the role of the lessor is that of a financier is inconclusive to show that a disguised secured transaction was intended because this kind of three party transaction is typical in true lease as well as in installment sales. *Accord In re Cress*, 1991 WL 35370 (10th Cir.1991); *Colorado Nat'l Leasing, Inc. v. Gary Refin-*

*ing Co. (In re Mesa Refining, Inc.)*, 65 B.R. 724, 729 (D.Colo.1986).[26]

Moreover, the uncontroverted evidence before me is that ParcTec is in the business of purchasing and leasing high-tech equipment, including the Atrium registers. (Tr. 39) As Debtor's own witness testified, it is common for a true lessee to select the registers without any assistance from the lessor. (Tr. 127) Lastly, this common practice is also substantiated by the fact that Debtor is treating the LDI and MetLife leases as true leases even though the roles of the lessors in those leases appear to be those of a financier. Apparently, ParcTec did not manufacture the registers described in the MetLife lease, did not assist Debtor in selecting those registers, and did not possess, ship, or install the registers. Likewise, although it is not clear from the record before me, since LDI is "a leasing company" (Tr. 41) and is "a competitor of ParcTec," (Tr. 42) it appears that LDI, like ParcTec, was simply a financier with respect to the LDI lease. Given the foregoing, I find ParcTec's role as that of a financier is inconclusive, if not irrelevant, in determining whether a secured transaction was intended.

 Although I do not find them to be substantial factors in reaching my conclusion, I note two provisions of significance in the Lease Agreement which further suggest that a true lease was intended: (1) the Lease Agreement requires Debtor to maintain insurance for the *greater of* the full replacement value or the Casualty Value, (i.e., an amount equal to the aggregate of the unpaid rentals plus 30% of the original purchase price) (¶ 10); and (2) at the end of the lease term not only are the registers required to be returned at Debtor's own expense, in the

---

**26.** In *Cress*, the Court of Appeals, in its unpublished opinion, upheld the district court's finding that the agreement before it was a true lease even though the lessor was not the owner/producer of the leased equipment. *See id.* at *2. Although the dissenting opinion contended that the court should give more weight to the fact that the lessor (1) did not ship nor install the equipment, (2) did not select nor inspect the equipment, and (3) was not a manufacturer nor dealer in like equipment, *see id.* at *3, the majority disagreed. To the majority, the question of whether the lessee could purchase the leased equipment at the end of the lease term for a

nominal sum was a more determinative factor evidencing a disguised secured transaction. *See id.* at *2.

Similarly, in *Mesa Refining*, the district court, reversing the bankruptcy court's finding that the transaction in question was a disguised secured transaction, noted that the fact that the equipment was chosen by the lessee and was delivered directly to the lessee was not a useful factor differentiating a true lease from a secured transaction. *See id.* at 728. The court held that such factors are, like the lessee's assumption of the indicia of ownership, "negotiated matters between the parties." *See id.*

same condition as when delivered, ordinary wear and tear excepted, to a location designated by lessor, but upon such return the equipment *must be certified* as eligible for maintenance by the vendor at its standard rates or a reputable third party maintenance company (¶ 11). To me, these provisions suggest that ParcTec expected a significant remaining useful life at the end of the lease term because these two provisions are designed to protect such an interest. *See* White & Summers, *Uniform Commercial Code, Article 2A, Leases of Goods,* 3d ed., West, 1991, at 5 (stating that a true lease "involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term").

### CONCLUSION

For the reasons set forth above, I find the Lease Agreement to be a true lease. Therefore, Debtor's obligations under the Lease Agreement are subject to the requirements of § 365(d)(10), and pursuant to § 365(d)(2), Debtor is directed to either assume or reject the Lease Agreement within sixty (60) days from the date of the entry of this memorandum opinion.