TISHMAN EQUIPMENT LEASING, INC. *v.* STUART I.
LEVIN, TRUSTEE IN BANKRUPTCY (ESTATE OF
UNDERWOOD PLASTIC CORPORATION)

KING, C. J., MURPHY, ALCORN, COMLEY and HOUSE, Js.

Argued June 2—decided July 7, 1964

*Harry M. Lessin*, for the appellant (defendant).

*John J. Relihan*, for the appellee (plaintiff).

ALCORN, J. The fundamental issue in this case is whether a transaction between Tishman Equipment Leasing, Inc., which we shall call Tishman, and Underwood Plastic Corporation, which we shall call Underwood, was a lease, or a conditional sale, of certain mechanical equipment. Tishman brought this replevin action to recover possession of the equipment from Underwood. Thereafter, Underwood was adjudicated a bankrupt, and Stuart I. Levin was appointed trustee in bankruptcy. The trustee was substituted as the party defendant, and he defended on the ground that the recovery of the machinery by the plaintiff would amount to a preferential transfer of property of the bankrupt, Underwood, which the trustee was entitled to avoid. The basis

of the claim of preference was that the transaction amounted to an attempted conditional sale which failed to comply with § 42-77 of the General Statutes, which was then in effect, and therefore that the transaction had to be treated as an absolute sale pursuant to § 42-79, also then in effect.[1] The court concluded that the transaction was a lease and rendered a judgment for the plaintiff from which the trustee has appealed.

The trial court's finding is not subject to correction in any material respect. The essential facts may be summarized as follows. In October, 1959, Irving L. Rabb, who later became president of Underwood, opened negotiations with Tishman for financing the acquisition of machinery to be used by Underwood, a corporation which Rabb intended to form, for the manufacture of plastic moldings. Tishman is a corporation engaged in the business of leasing equipment to, and purchasing machinery for, customers lacking the money or credit to buy it. Underwood was incorporated on November 29, 1959, and Rabb was its controlling stockholder. For its intended operations Underwood needed three injection-molding machines. Such machines are customarily operated twenty-four hours a day, are constantly subject to design changes, and have a high rate of obsolescence. It was mutually advantageous, for income tax and other purposes, for Underwood to lease the machines from Tishman.

On November 30, 1959, Tishman and Underwood entered into a lengthy printed instrument entitled an "Equipment Lease Agreement." Under it, Tishman leased to Underwood three injection-molding machines, described in a schedule attached to the lease,

---

[1] Sections 42-77 and 42-79 of the General Statutes were repealed by § 10-102 of No. 133 of the 1959 Public Acts.

for a term of three years beginning February 1, 1960, at a monthly rental of $2683, payable in advance. Title to the machines was expressly stated to be in Tishman. At the end of the three-year term, Underwood had the option of renewing the agreement for yearly periods at a monthly rental of $202, but, in the event the renewal privilege was not exercised, the machines were to be returned to Tishman. By a separate agreement in letter form, on November 30, 1959, Tishman gave Rabb, individually, an option to purchase the machines for $8076 at the expiration of the three-year term, if Underwood had then fully performed and had not exercised its privilege of renewal. The rental payments for the three-year term totaled $96,588. The equipment lease agreement made no reference to a purchase price and contained no provision that upon full payment of the rent, or the rent and a nominal additional amount, either Underwood or anyone else would become entitled to ownership of the machines, or that Tishman would be required to transfer title thereto to Underwood or to anyone else. The agreement did provide that, upon default or in the event Underwood was adjudicated a bankrupt, Tishman was entitled to repossess the machines. Tishman purchased the machines from the manufacturer for $80,760, which they were then worth. In January, 1960, the machines were installed in Underwood's factory and were thereafter used in Underwood's manufacturing operations. The machines would, with proper care and allowance for obsolescence, be worth about $8076 at the effective date of Rabb's option right. The equipment lease agreement was not acknowledged, but it was filed on February 11, 1960, in the office of the town clerk in Norwalk, where Underwood's factory was located.

While the machines were in the possession of Underwood, it dealt with them as rented equipment. Tishman insured the machines and dealt with them as owner. Both Underwood and Tishman intended to, and did, take advantage of their respective permissible deductions under the income tax law, Tishman as owner and Underwood as lessee of the machines.

Underwood defaulted in the payment of the September, 1960, rent, and it continued to default for the succeeding six months. During this period, Underwood informed Tishman of its inability to pay the monthly rent, and, having reason to be concerned about Underwood's financial ability, Tishman replevied the machines by process dated March 17, 1961. On April 3, 1961, Underwood filed a petition for a debtor proceeding under the Bankruptcy Act and was adjudicated a bankrupt on June 28, 1961. When Tishman replevied the machines, they were worth about $45,000. Underwood was then insolvent, with assets amounting to about $8000 and total debts of $131,000.

On these facts, the court concluded that the transaction was intended to be, and was, a lease; that the absence of an acknowledgment and Underwood's adjudication in bankruptcy were of no consequence; and that Tishman was entitled to possession of the machines. In asserting that the transaction was a conditional sale, the defendant seeks to ignore the corporate entity and import into the transaction the option given by Tishman to Rabb. The claim, in substance, is that because of the size of the rental payments in comparison to the original value of the machines, the amount of the consideration required of Rabb in the event that he exercised his independent option to purchase, and Rabb's control of

Underwood, the legal effect was a conditional sale of the equipment to Underwood through Rabb as its alter ego. The argument has a fundamental weakness in that no claim is made that there was any fraudulent or illegal purpose in the dealings in issue. It is true that courts will disregard legal fictions, including that of a separate corporate entity, when the corporation is a mere sham or device to accomplish some fraudulent or illegal purpose. *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432, and cases cited. Unless some element of this sort is established, however, there is no occasion for refusing to recognize the corporate entity as such.

The case must be viewed, therefore, as a transaction between Tishman and Underwood, as in reality it is. Regardless of what name the parties give to a transaction, the courts, in general, look beyond the form to the substance, and when one who is called a lessee may become the owner of the leased property at the end of a lease term on full payment of the stipulated rent or by the payment of a small additional amount, the transaction is generally held to be a conditional sale, even though it is couched in the terms of a lease. Williston, Sales (Rev. Ed.) § 336, p. 296; see cases collected in 47 Am. Jur., Sales, § 836; notes, 175 A.L.R. 1366, 1384, 92 A.L.R. 304, 323, 43 A.L.R. 1247, 1257, 17 A.L.R. 1421, 1436. In other words, if the intended effect and the principal purpose of the parties is that, by force of the contract, the general property in the subject matter is to pass, for an agreed price, from its owner to a purchaser on the performance by the latter of certain conditions, the transaction will generally be held to be one of conditional sale regardless of the name or form given it by the parties. *H. G. Craig &*

Co. v. *Uncas Paperboard Co.*, 104 Conn. 559, 564, 133 A. 673; *Hartford-Connecticut Trust Co.* v. *Puritan Laundry, Inc.*, 95 Conn. 172, 181, 111 A. 149; *Unmack* v. *Douglass*, 75 Conn. 633, 635, 55 A. 12; *In re Wilcox & Howe Co.*, 70 Conn. 220, 228, 39 A. 163; *Loomis* v. *Bragg*, 50 Conn. 228, 231; *Hine* v. *Roberts*, 48 Conn. 267, 269. In the determination of the actual intent and purpose of the transaction, the negotiations surrounding it may properly be considered, and its real nature is a question of fact to be resolved by the trier. *Lambert Hoisting Engine Co.* v. *Carmody*, 79 Conn. 419, 424, 65 A. 141.

The facts found by the trial court give adequate support to its conclusion that the transaction in issue is a lease. The document executed by the parties explicitly provided for retention of title by Tishman, the delivery of possession to Underwood, and Underwood's obligation to pay a monthly rental for a specified term with an option to renew. There was no provision in the agreement by which Underwood could, under any circumstances, obtain title or require Tishman to convey title. See General Statutes § 42-83 (e). In the event of a default or a failure to renew at the end of the term, Underwood was obligated to relinquish possession of the property to Tishman. In addition, the market value of the machinery would have been 90 percent consumed during the term of the agreement owing to obsolescence, so that Tishman was being compensated for the use, rather than being paid the purchase price of the machinery. See *Western Contracting Corporation* v. *Commissioner of Internal Revenue*, 271 F.2d 694, 700 (8th Cir.); Blumenthal & Harrison, "The Tax Treatment of the Lease with an Option to Purchase," 32 Texas L. Rev. 839, 857. These elements, all of which are characteristic of a lease, were

not affected by the separate option agreement which afforded Rabb an opportunity to purchase the machines in the event that Underwood elected not to continue as lessee.

A claim that the judgment was void, having been rendered too late, may be briefly disposed of. The case was tried in March, 1962, during the winter session of the court. The ensuing spring session ended on September 13, 1962. By stipulation dated September 6, 1962, made during the spring session, the parties stipulated that "any objection to judgment being entered after the expiration of the present [i.e., spring 1962] term of court is hereby waived." The statute requires that trial shall be ended and judgment rendered "before the close of the next term or session." General Statutes § 51-29. A late filing of a judgment may, however, be waived by conduct or agreement, express or implied. *Hurlbutt* v. *Hatheway,* 139 Conn. 258, 263, 93 A.2d 161. The language of the stipulation between the parties was a clear waiver of a late rendition of the judgment, and the language "after the expiration of the present term of court" imposed no limitation on the duration of that waiver. The judgment was rendered on January 3, 1963, and, in view of the stipulation, was valid.

There is no error.

In this opinion the other judges concurred.