**In re APB ONLINE, INC., Debtor.**

**No. 00 B 41675(SMB).**

United States Bankruptcy Court, S.D. New York.

March 22, 2001.

Peretore & Peretore, P.C., Frank Peretore, of counsel, Sparta, NJ, for Leasing Technologies, Inc.

Clifford Chance Rogers & Wells LLP, John S. Mairo, of counsel, New York City, for Official Committee of Unsecured Creditors.

Herbert P. Minkel, Jr., New York City, for debtor.

## MEMORANDUM DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

STUART M. BERNSTEIN, Chief Judge.

Prior to this chapter 11 case, Leasing Technologies, Inc. ("LTI") and the debtor APB Online, Inc. (the "debtor" or "APB") entered into two agreements, denominated leases, entailing the use of computer and other equipment. After filing for chapter 11 relief, the debtor kept the equipment for approximately two months, but didn't pay the post-petition rent. Through this motion, LTI is seeking to recover that administrative claim.[1]

The debtor and the Official Committee of Unsecured Creditors (the "Committee") argue that the leases are not "true leases," but rather, disguised sales coupled with the reservation of security interests. In that case, no post-petition rent would be due. With the parties' consent, I have treated LTI's application as a motion for summary judgment.

The motion presents a familiar dispute. Under the 1972 version of UCC 1–201(37), which governs the parties' rights, the nature of the transaction depends on the intent of the parties. Questions of intent are rarely susceptible to summary judgment, and this one is no exception. The record is insufficient to rule as a matter of law, and accordingly, summary judgment must be denied.

## BACKGROUND

At all relevant times, the debtor operated a web-based information services company. During the same relevant period, LTI engaged in the business of financing third party acquisitions of business equipment. On August 19, 1999, the parties entered into a "Master Lease Agreement" which appended two schedules. Each schedule included additional lease terms, and listed various items of computer, audio, video and telephone equipment (collectively, the "Equipment"). The Master Lease Agreement and each schedule comprised a separate lease,[2] and pursuant to the leases, LTI conveyed the Equipment to APB for the stated terms.

Except for the commencement dates[3] and the financial terms, the leases were substantially identical. Each lease ran for thirty-six months, and the rent was a function of the purchase price and the prevailing interest rate. For example, the purchase price of the equipment on Schedule No. 1 was listed as $210,397.29. LTI charged a monthly rent of $6,853.00, based on an 8.50% prime rate. If the prime rate increased by 0.25%, the monthly rent rose by $22.00. Similarly, the purchase price for the equipment on Schedule No. 2 totaled $94,769.94, and the monthly rent of $3,076.00 was based on a prime rate of

---

**1.** Other issues raised by the motion have been resolved or mooted.

**2.** For ease of reference, this opinion uses "lease" terminology in discussing the transaction. This does not reflect a determination that the transaction involves a "true lease."

**3.** "Schedule No. 1" became effective Feb. 1, 2000, while "Schedule No. 2" became effective on January 1, 2000.

8.25%. The monthly rent increased by $11.00 for each 0.25% increase in the prime rate.

APB could not terminate the leases during the thirty-six months, and had to pay rent "come hell or high water." At the end of three years, the debtor faced three choices. First, it could purchase the Equipment for 14.5% of the purchase price, or the aggregate sum of $44,249.25. Second, it could extend the leases for an additional twelve months at 60% of monthly rentals, or the aggregate amount of $71,488.80, and then buy the Equipment at the end of the fourth year for $1.00 per schedule. Third, APB could restore the Equipment to the state and condition described in the Master Lease Agreement, return it to LTI and pay a re-marketing charge equal to 5% of the purchase price, or the aggregate sum of $15,258.36.

APB stopped making the monthly lease payments in June 2000, and filed this chapter 11 case on July 5, 2000. LTI recovered the Equipment on or about September 7, 2000. LTI now seeks payment of $22,214.30 in post-petition rent accruing between those two dates. (Supplemental Affidavit of James Riling, sworn to Nov. 3, 2000 ("Supplemental Riling Affidavit"), at ¶¶ 2–3.)

## DISCUSSION

### A. Summary Judgment Standards

Fed.R.Civ.P. 56, made applicable to this adversary proceeding by Fed.R.Bankr.P. 7056, governs summary judgment motions. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995);

*Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991). If the movant carries this initial burden, the non-moving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether material factual issues exist, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. "Lease" v. "Security Interest"

State law normally determines the extent of an interest in property, absent an overriding federal policy. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Morton v. Nat'l Bank of New York City (In re Morton)*, 866 F.2d 561, 563 (2d Cir.1989). Accordingly, "[w]hether ... a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." *In re Powers*, 983 F.2d 88, 90 (7th Cir.1993) (quoting H.R.Rep. No. 95–595, at 314 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6271; S.Rep. No. 95–989, at 26 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5812). The Master Lease Agreement contains a Connecticut choice of law clause, and the parties agree that Connecticut law governs their rights.

Whether the transaction involves a lease or disguised sale under Connecticut law depends on the intention of the parties as determined by the facts of each case. *Granite Equip. Leasing Corp. v. Acme Pump Co.*, 335 A.2d 294, 296 (Conn.1973); *see Tishman Equip. Leasing, Inc. v. Levin*, 152 Conn. 23, 202 A.2d 504, 507 (1964)

(discussing pre-UCC law). The Court must look beyond the form to the substance of the agreement, *id.; Tennant Co. v. Martin's Landscaping, Inc.*, 40 Conn. Supp. 475, 515 A.2d 665, 667 (1986), and may consider the surrounding negotiations. *General Elec. Capital Corp. v. Palutsis*, No. 94–C–3782, 1995 WL 263459 at *2 (N.D.Ill. May 2, 1995)(applying Connecticut law); *Tishman Equip. Leasing, Inc. v. Levin*, 202 A.2d at 507; *Delta Leasing Servs. Corp. v. Gentile*, No. CV–88–0097669, 1994 WL 76851 at *3 (Conn.Super.Ct. Mar. 1, 1994); *Oxford Resources Corp. v. Burdo Painting, Inc.*, No. CV–91–280005, 1992 WL 204691 at *2 (Conn.Super.Ct. Aug. 19, 1992); *see In re Leasing Consultants, Inc.*, 486 F.2d 367, 373 (2d Cir.1973)(in determining whether a transaction involves a "true lease" or a disguised security interest, the court may consider factors outside the lease as well as the contents of the lease).

■ At common law, a lease transfers an estate in property to the tenant for a stated term, with the right to use and possession reverting to the lessor at the expiration of the lease. *Monarch Accounting Supplies, Inc. v. Prezioso*, 170 Conn. 659, 368 A.2d 6, 9 (1976); *Jo–Mark Sand & Gravel Co. v. Pantanella*, 139 Conn. 598, 96 A.2d 217, 218 (1953). Hence, regardless of what the parties call their deal, its characterization ultimately turns on whether it grants the lessee the use of the property for its remaining economic life. As aptly stated in *In re Marhoefer Packing Co.*, 674 F.2d 1139 (7th Cir.1982):

> An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of the lease is substantially equal to the life of the leased property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale.

*Id.* at 1145; *accord In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 816 (Bankr. D.Del.1997); *see Tishman Equip. Leasing,*

*Inc. v. Levin*, 202 A.2d at 507; *see generally* 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30–3, at 18 (4th ed.1995)("WHITE & SUMMERS") (discussing the 1987 revision to UCC § 1–201(37)). Thus, when we speak of the intent to sell or lease, we mean the intent to convey the use of the property for its remaining useful life to the lessee, or alternatively, to vest a reversionary interest in the lessor at the end of the term.

UCC § 1–201(37) governs whether the transaction is a lease or a sale. There are at least three versions of UCC § 1–201(37) in effect throughout the nation. Connecticut has adopted the 1972 version which states in pertinent part:

> "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer is limited in effect to a reservation of a "security interest".... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security....

CONN.GEN.STAT.ANN. § 42a–1–201(37) (West 2000).

■ Under subparagraph (b), a transaction is conclusively presumed to be a sale if the lessee has the right or option to become the owner of the property for no additional consideration or nominal consideration upon compliance with the lease conditions. *In re Marhoefer Packing Co.*, 674 F.2d at 1142. The presumption reflects the inference that arises in light of the common law definition of a

lease. If the parties effectively transfer the use of the property to the lessee for its entire economic life, and do not expect any interest to revert to the lessor, they are presumed to intend a sale. The converse presumption does not, however, hold. In other words, if the transaction does not satisfy UCC § 1–201(37)(b), we do not conclusively presume a lease. Instead, the court must consider all of the facts and circumstances to decide intent. *In re Powers,* 983 F.2d at 91; *In re Marhoefer Packing Co.,* 674 F.2d at 1145.

■ Accordingly, the first step in analyzing the transactions between APB and LTI is to determine whether the option price is nominal. Initially, the leases contain two purchase options and two option prices. APB can buy the Equipment for $44,249.25 at the end of three years. In the alternative, it can renew the leases for one more year, pay another $71,488.00 in rent, and purchase the Equipment for $1.00 per schedule, or $2.00, at the end of four years.

Only the first option matters, and *In re Marhoefer* is directly on point. There, the debtor faced a similar choice. It could purchase the leased property at the end of four years for approximately $10,000.00. Alternatively, the debtor could renew the lease for an additional four years at an annual rent of approximately $3,000.00 payable in advance, and purchase the property at the end of the second four year term for $1.00. 674 F.2d at 1141.

The Court concluded that the second option was immaterial to the analysis.

The conclusive presumption under UCC § 1–201(37) does not apply if the lessee has the right to terminate the lease and stop paying rent before the option becomes exercisable. *Id.* at 1143. If the debtor terminated the transaction at the end of the first period and stopped paying rent, it would never reach the second option exercisable four years later. Similarly, APB had the legal right to terminate the leases at the end of the third year, without triggering the second, extended term and the option at the end of the fourth year.[4] Thus, the question is whether the first option price is nominal.

### 1. The Nominality Test

■ Consideration may be sizeable yet still be nominal under UCC § 1–201(37). *Granite Equip. Leasing Corp. v. Acme Pump Co.,* 335 A.2d at 295. Most cases measure nominality by comparing the option price to the (1) fair market value at the time the option is exercised, (2) the original purchase price of the property, or (3) the aggregate rent paid under the lease. *Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258, 1261–62 (7th Cir.1991); *In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 811 n. 12 (Bankr.D.Del.1997); *NYNEX BISC v. Beker Indus. Corp. (In re Beker Indus. Corp.),* 69 B.R. 937, 940–42 (Bankr.S.D.N.Y.1987)(applying Connecticut law). Of the three, the first is preferred, 4 WHITE & SUMMERS § 30–3, at 14–15, because the other two, whose results are usually expressed as percentages, are "the crudest of proxies for the correct calculation." *See id.* § 30–3, at 15.[5]

---

4. The second option also makes no economic sense. If the debtor wanted to own the Equipment, he could pay $44,249.25 at the end of three years, or $71,488.80, payable monthly during the fourth year. Comparing the two choices, the second option is the equivalent of borrowing $44,249.55 at the beginning of the fourth year, and repaying the loan plus $27,239.35 in interest during that year. Even if the debtor did not have the cash to exercise the option at the end of the third year, I assume it could have borrowed $44,249.25, repayable in one year, at a substantially lower interest rate.

5. For example, the second test yields an option to purchase price percentage of 14.5%. On the one hand, option prices of as much as 25% have been considered nominal. E. Carolyn Hochstadter Dicker & John P. Campo, *FF & E and The True Lease Issue: Article 2A and Accompanying Amendments to UCC Section 1–201(37 ),* 7 Am. Bankr.Inst. L.Rev. 517, 543 & n. 90 (Winter 1999); 4 WHITE & SUMMERS § 30–3, at 14 & n. 31. On the other hand, the Connecticut Supreme Court declined, in *Granite Equip. Leasing Corp. v. Acme Pump Co.,* to rule that an option price equal to 10%

██ The first test compares the option price, not to the actual fair market value at the time the option is exercised, but to what the parties thought the fair market value would be on the exercise date when they entered into the lease.[6] *Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d at 1262; *In re Marhoefer Packing Co.*, 674 F.2d at 1144–45. A lease stating that the lessee may purchase the equipment at the fair market value, determined at the time that the option is exercised, gives rise to an inference that the option price is *not* nominal.[7] *Jahn v. M.W. Kellogg Co. (In re Celeryvale Transp., Inc.)*, 822 F.2d 16, 18 (6th Cir.1987); *In re Edison Bros. Stores, Inc.*, 207 B.R. at 810; *In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465, 468 (Bankr. S.D.N.Y.1990). The inference may be rebutted by proof that parties expected the fair market value at the end of the lease term to be negligible. *In re Celeryvale Transp. Inc.*, 822 F.2d at 18; *In re Edison Bros. Stores, Inc.*, 207 B.R. at 810; *In re Beker Indus. Corp.*, 69 B.R. at 941.

██ At first blush, APB's option price appears to fail the nominality test. The Master Lease Agreement stated that the option price would be the fair market value of the Equipment at the end of the initial term, defined what fair market value meant, and set out a procedure for determining the option price in case of a dispute. (Master Lease Agreement ¶ 13.) The two schedules fixed the option price in the aggregate amount of $44,249.25, hardly negligible, and LTI has submitted affidavit testimony stating that the amount of the option price was based on the projected fair market value at the end of three years. (Riling Supplemental Affidavit ¶ 5.)

The evidence is nevertheless inconclusive because LTI failed to establish a foundation for this testimony. Riling's Supplemental Affidavit did not say that he participated in the lease transactions or the computation of the option prices. Absent personal knowledge, the danger lurks that his testimony may be based on inadmissible hearsay, *see Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 n. 9 (2d Cir. 1980)("[a] hearsay affidavit is a nullity on a motion for summary judgment"), or on the assumption that the scheduled option prices reflect what the Master Lease Agreement says they should, whether or not they actually do.

██ Furthermore, comparing the option price and anticipated fair market value, but ignoring the economic realities of the choice, may skew the result. An option price might seem high compared to the fair market value (or original purchase price or gross rents), but still be too good to pass up. For example, it may cost a lot less to pay a seemingly high option price than to terminate the lease and return the property. If the parties anticipated this situation, they probably expected that the lessee would exercise the option, and the lessor would never get the property back. Evidence that the lessee lacks a meaningful economic choice, *i.e.*, no rational person would decline to exercise the option, indicates nominal consideration. *Percival Const. Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 171 (10th Cir. 1976)("only sensible course of action … available to him as a businessman"); *Sight & Sound of Ohio, Inc. v. Wright*, 36 B.R.

---

of the original purchase price was nominal as a matter of law. 335 A.2d at 295. Under the third test, APB's option price equals 12.4% of the aggregate monthly rent, just slightly above the percentages deemed nominal by the courts. *See Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d at 1261–62 (collecting cases). Neither result provides an indication of the parties' intent.

**6.** Unforeseen inflation or obsolescence, which may drastically affect the actual market value at the time of the exercise, would not alter the parties' expectations at the time of contracting. *See* 4 WHITE & SUMMERS § 30–3, at 15.

**7.** As noted, the unrebutted inference that the option price is not nominal does not end the inquiry. If the conclusive presumption in favor of nominality does not apply, the court must consider the facts of the case.

820

885, 890 (D.C.Ohio 1983)(no plausible alternative because of substantially less attractive options); *In re Taylor,* 209 B.R. 482, 486 (Bankr.S.D.Ill.1997)(no reasonable alternative except to exercise the option); *In re Beker Indus. Corp.,* 69 B.R. at 939 (only "sensible course" is to exercise the option); *In re Winston Mills, Inc.,* 6 B.R. 587, 597 (Bankr.S.D.N.Y.1980)(only sensible option for the lessee was to purchase the property at the end of the term); *see* 4 WHITE & SUMMERS § 30–3, at 13–14.

The economic realities also seem to point to a lease, at least on the first glance. At the end of three years, APB could buy the Equipment and pay the $44,249.25 option price, or return the Equipment and pay a 5% re-marketing fee, totaling $15,258.36. However, the leases also imposed additional, unliquidated costs on APB. Prior to returning the equipment, APB had to "arrange and pay for any repairs, changes and manufacturer's certifications as are necessary for the manufacturer or Maintenance Organization to accept the Equipment under contract maintenance at its then standard rates." (Master Lease Agreement ¶ 5(j).)

The record does not reflect the expected restoration costs. If the parties anticipated costs that, when added to the re-marketing fee, made exercising the option the only rational choice, they probably intended a sale. Conversely, the expectation of minimal restoration costs would imply a lease.

In sum, the most appropriate nominality test measures the option price against the expected fair market value, and weighs that result against the economic realities of the choice between exercising the option or returning the property. The record is insufficient to permit me to conclude as a matter of law that the APB option price was or was not nominal under this test.

## 2. Indicia of Ownership

■ If the conclusive presumption in UCC § 1–201(37)(b) does not apply, either because the evidence is insufficient or the nominality test points to a lease, the court must examine the facts and circumstances of the transaction. Courts have developed a laundry list of criteria which arguably provide circumstantial evidence of the parties' intent. In *K.L.C., Inc. v. Brookside Drug Store, Inc. (In re Brookside Drug Store, Inc.),* 3 B.R. 120 (Bankr.D.Conn. 1980), the bankruptcy court identified sixteen factors:

(1) whether there was an option to purchase for a nominal sum, (2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (3) whether the nature of the lessor's business was to act as a financing agency, (4) whether the lessee paid a sales tax incident to acquisition of the equipment, (5) whether the lessee paid all other taxes incident to ownership of the equipment, (6) whether the lessee was responsible for comprehensive insurance on the equipment, (7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (8) whether the agreement placed the entire risk of loss upon the lessee, (9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee, (10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee, (11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment, (12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement, (13) whether there was a default provision in the lease inordinately favorable to the lessor, (14) whether there was a provision in the lease for liquidated damages, (15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part

of the lessor, (16) whether the aggregate rentals approximate the value or purchase price of the equipment.

*Id.* at 122–23.

Most of these factors look to the lease terms. Their probative value rests on the assumption that certain rights and obligations are allocated to one party under a lease and to the other in a sale. According to the legislative history accompanying 11 U.S.C. § 502(b)(6):

> [T]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.

S.Rep. No. 95–598, at 64 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5850; *accord See Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 201 (2d Cir.1986).

Here, the majority of *Brookside* factors indicate a sale. APB had to pay all taxes, including sales tax, on the Equipment. (Master Lease Agreement ¶ 4.) LTI expressly disclaimed all warranties. (*Id.* ¶ 7.) APB bore the full risk of loss, and was obliged to insure the Equipment at its own expense. (*Id.* ¶ 8.) APB authorized LTI to file UCC Financing Statements. (*Id.* ¶ 14(g).) In the event of a default, LTI could accelerate the debt, and recover liquidated damages in the amount of the past due rent and the present value of future rent. If LTI seized and then resold or relet the Equipment, APB acquired an equity interest in the Equipment. Once LTI recovered its liquidated damages and the expected residual value of the Equipment at the end of the initial term, APB was entitled to any additional sales or rental proceeds. (*Id.* ¶ 9(g).)

Although these factors intimate a sale, the underlying assumption is shaky, particularly with the growth use of finance leasing transactions. Many of the lease terms are equally consistent with a sale or lease. 4 WHITE & SUMMERS § 30–3, at 17; *see* UNIF. COMMERCIAL CODE § 1–201(37) cmt. 37 (1987 revision), 1 U.L.A. 74 (1989). Their allocation "reflect[s] less the true character of the transaction than the strength of the parties' respective bargaining positions." *In re Marhoefer Packing Co.,* 674 F.2d at 1146; *accord Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d at 1262–63; *In re Edison Bros. Stores, Inc.,* 207 B.R. at 818–19. Accordingly, absent testimony explaining the reason for the allocation of these rights and duties, their presence does not imply a sale.

Other factors look beyond the lease terms to the circumstances of the transaction. These may be more probative of intent. Relevant extrinsic factors include whether the rent is calculated to compensate the lessor for the use of the property, or instead, to ensure a return on the lessor's investment, whether the property is purchased specifically for the lessee's use, whether the transaction is structured as a lease rather than a loan to secure tax advantages, and whether the aggregate rents exceed the original purchase price of the property. *See In re PCH Assocs.,* 804 F.2d at 200–01.

The extrinsic factors identified in *PCH* also point toward a sale. The monthly rent charged by LTI was designed to ensure a specific return on its investment in the Equipment, and increased in lockstep with the prime rate. Furthermore, APB selected the Equipment, and LTI provided the financing for the purchase. (Transcript of hearing, held Nov. 15, 2000, at 17.) In addition, the deal was tax-motivated. Paragraph 7 of both schedules stated that LTI's obligations "are subject to there being no tax legislation enacted prior to the installation date which would have an adverse effect on the rights or anticipated benefits to" LTI or its assignee.

■ Finally, the aggregate rent charged by LTI exceeded the purchase price of the Equipment, again indicating a sale. *See, e.g., Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d at 1262; *National Equip. Rental, Ltd. v. Priority Electronics Corp.,* 435 F.Supp. at 239; *In re Edison Bros. Stores, Inc.,* 207 B.R. at 814; *In re Beker Indus. Corp.,* 69 B.R. at 942; *cf. In re Marhoefer Packing Co.,* 674 F.2d at 1145 (evidence that total rent was substantially less than purchase price of the equipment shows that a sale was not intended). This inference rests on the assumption that the rent payments cover the purchase price plus a reasonable return of the lessor's investment. *In re Edison Bros. Stores, Inc.,* 207 B.R. at 814; *see In re PCH Assocs.,* 804 F.2d at 201 (quoting S.Rep. No. 95–598, at 64 (1978)).

The record shows that the Equipment cost $305,167.23, and APB was obligated to pay $9,929.00 each month for 36 months. The aggregate rent payments total $357,444.00, $52,276.77 (or 17.1%) more than the purchase price. Factoring in the time-value of the payments produces an annual "return" of 10.57%. Stated somewhat differently, if LTI loaned APB $305,167.23 to buy the Equipment, and APB paid off the entire loan at the rate of $9,929.00 each month for 36 months, the loan would bear interest at the annual rate of 10.57%.

Although this is some evidence that the parties intended a sale, the record on this motion is insufficient because it lacks proof of what a reasonable return might approximate. Moreover, the payment of a reasonable rate of return may not provide an accurate picture of the parties' intent where, as here, the Equipment retained useful economic life that LTI could sell or lease after the end of the three year term. *See In re Edison Bros. Stores, Inc.,* 207 B.R. at 816 n. 23. In the end, the record is insufficient to permit me to decide as a matter of law, in accordance with LTI's motion, that the transactions with APB were leases.

## C. The "New" UCC § 1–201(37)

Thus far, the discussion has centered on the 1972 version of UCC § 1–201(37) in effect in Connecticut. A 1987 revision, however, made in connection with the promulgation of Article 2A, has been adopted by a majority of the states.[8] *See* UNIF. COMMERCIAL CODE, 1 U.L.A. 40–41 (West Supp. 2000). The 1987 version, which is set out in the accompanying footnote,[9] substitutes a more objective test for the one imposed under the 1972 version. UNIF. COMMERCIAL CODE § 1–

---

8. An even more recent amendment, accompanying the revision to Article 9, has been adopted in seven states. *See* UNIF. COMMERCIAL CODE, 1 U.L.A. 40–41 (West Supp. 2000).

9. The 1987 revision states, in pertinent part: "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,
(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.
A transaction does not create a security interest merely because it provides that
(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,
(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

201(37) cmt. 37, 1 U.L.A. 75 (1989). It deletes references to the parties' intent, and eschews the laundry list of factors relied on in cases like *Brookside*. *Id.* at 74 (1989). LTI argues that I should apply the 1987 version of UCC § 1–201(37), and conclude that the leases are true leases.

I must decline LTI's invitation as the Connecticut legislature has considered but repeatedly refused to adopt Article 2A and revised UCC § 1–202(37). *See* Charles A. Heckman, *Unconscionability and Personal Property Leasing Law in Connecticut*, 18 QUINNIPIAC L. REV. 203, 208 (1998); Charles A. Heckman, *Personal Property Law In Connecticut: The Dubious Benefits of Article 2A*, BRIDGEPORT L. REV. 503, 503–04 (1993).[10] It is true that some Connecticut courts have applied Article 2A to resolve certain disputes arising under Article 2. *See Emlee Equip. Emlee Leasing Corp. v. Waterbury Transmission, Inc.*, 31 Conn.App. 455, 626 A.2d 307 (1993)(unconscionability); *Datronic Equip. Income Fund, XX, L.P. v. Healey Ford–Lincoln–Mercury, Inc.*, No. CV–960055904, 1997 WL 133510 (Conn.Super.Ct. Mar. 5, 1997)(breach of warranty); *cf. Financing For Science Int'l, Inc. v. A.C. Trams, Inc.*, Civ. A. No. 94–3198, 1994 WL 705422 (D.N.J. Dec. 15, 1994)

(unconscionability)(applying Connecticut law). These provisions, however, merely fill gaps in Connecticut law. In this case, there is no gap since the Connecticut version of UCC § 1–201(37) addresses the question presented by LTI's motion. Further, the "intent of the parties" standard pronounced by the Connecticut Supreme Court in the *Granite Equipment* case is still good law.

In any event, the test under the revised UCC § 1–201(37) is substantially similar to the inquiry under the 1972 version. It is not surprising, therefore, that it leads to the same result on this motion. The drafters of the 1987 revision sought to refocus attention on " 'the significance of residual value as the touchstone of the common law definition of true leases.' " 4 WHITE & SUMMERS § 30–3, at 18 (quoting Naples, *A Review and Analysis of the New Article 2A*, 93 COM. L.J. 342, 349 (1988)). In effect, the 1987 revision "sends the lawyer on a search for that interest. If it can be found, the transaction is a lease; if none can be found, the transaction is a sale with a security interest." *Id.*

The new test consists of two parts. First, the obligation to pay rent cannot be subject to termination by the lessee. Sec-

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For purposes of this subsection (37):

(x) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nomi-

nal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(y) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(z) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

10. Bills to adopt Article 2A and revised § 1–201(37) are, once again, under consideration by the Connecticut legislature. *See* Sen. 1314, Gen. Assem. Reg. Sess. (Conn.2001)

ond, the lease must give the lessee either the use of the goods for their remaining economic life, or the option to acquire that right for nominal or no additional consideration. APB's leases easily meet the first part because APB was obligated to pay the rent for thirty-six months, even if the Equipment was destroyed or became unusable. (*See* Master Lease Agreement ¶ 8(b).)

The second part incorporates four mutually exclusive possibilities, each signifying the absence of a reversionary interest: (1) the term of the lease is equal to or greater than the remaining economic life of the property, (2) the lessee is obligated either to renew the lease for the remaining economic life or to become the owner, (3) the lessee can renew the lease for the remaining economic life upon compliance with the agreement for little or no additional consideration, or (4) the lessee can become the owner for the remaining economic life, upon compliance with the agreement, for little or no additional consideration. The last subpart applies to this case.

Although this formulation sounds like the conclusive presumption under the 1972 version of UCC § 1–201(37), there are some differences. The 1972 version did not attempt to define nominal consideration, and most courts applied one or more of three judicially-developed ratios. The 1987 revision adopts the option price to fair market value comparison, and then considers the result in light of the economic realities of the choice. Thus, consideration is not nominal if the option price is stated to be the "fair market value" determined at the time the option is to be performed. However, if the additional consideration is less than the "reasonably predictable cost of performing" by not exercising the option, the consideration is nominal. UCC § 1–201(37)(x)(ii). The "reasonably predictable cost ... must be determined with reference to the facts and circumstances at the time the transaction is entered into." *Id.* § 1–201(37)(y).

Not surprisingly, applying the 1987 revision reveals the same shortcomings in the

record. The Master Lease Agreement stated that option price would be the fair market value at the option date, and each schedule liquidated that amount. If Mr. Riling's affidavit could not carry LTI's evidentiary burden under the 1972 version, it cannot satisfy it under the 1987 revision either. In the same vein, the strength of the record regarding the anticipated costs associated with not exercising the option is no better under the 1987 revision than it was under the 1972 version of UCC § 1–201(37).

## CONCLUSION

The motion for summary judgment is denied. The parties are directed to contact chambers to arrange a status conference. At the conference, the Court will fix a trial date.

So Ordered.